FILED
2021 Apr-22  PM 02:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

JOHN MCCARLEY,

     Plaintiff,

v.

JEFFERSON DUNN, STEVE
WATSON, JENNY ABBOTT,
ARNALDO MERCADO, EDWARD
ELLINGTON, MATTHEW BRAND,
KARLA JONES, ERROL PICKENS,
NEKITRIS ESTELLE, GARY
MALONE, KEVIN WHITE, CARLA
GRAHAM, LARRY R. BAKER,
ANTOINE PRICE, DERRICK DENT,
UNKNOWN SHIFT
COMMANDERS, and UNKNOWN
CORRECTIONAL OFFICERS,

     Defendants.

Case No. _____

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff John McCarley files this Complaint pursuant to 42 U.S.C. § 1983 to recover for violations of his rights under the United States Constitution and pursuant to Alabama state law. In support hereof, Mr. McCarley states as follows:

## INTRODUCTION

1.    This lawsuit is one of many actions brought to address the unconstitutional conduct and conditions that have persisted for years at St. Clair

Correctional Facility in Springville, Alabama ("St. Clair Prison").

2.      Defendants and other officials responsible for inmate safety at St. Clair Prison have repeatedly flouted the Eighth Amendment to the United States Constitution, which imposes a duty on officers and prison officials to protect inmates from violence, including violence at the hands of other inmates.

3.      Due to this misconduct, St. Clair Prison, a Level 5 "close" or "maximum" security institution, is known as one of the most dangerous prisons in Alabama, if not the country. Assault, rape, murder, and other violence have become far too common at St. Clair Prison. A recent study, in fact, demonstrated that the homicide rate at St. Clair Prison was forty-five times higher than the national rate for state prisons in the United States.

4.      That is not a mere coincidence—it is the result of years' worth of Defendants' intentional acts or omissions, neglect, and conscious disregard for the well-being of inmates under their custody at St. Clair Prison, all to the physical and emotional detriment of those inmates.

5.      This conduct has not gone unnoticed. It prompted a class action lawsuit in 2014 that sought to protect the constitutional rights of inmates at St. Clair Prison. *See Duke v. Thomas, et al.*, No. 4:14-cv-1952 (N.D. Ala. filed Oct. 13, 2014) (the "*Duke* Litigation"). Through a settlement of the *Duke* Litigation, the leaders of St. Clair Prison, including some of the Defendants, agreed to make various changes in

2

the operation of the prison, including changes to management, controls and procedures, and other reforms to ensure the future protection of inmates. But the agreed-upon actions in the settlement have gone unfulfilled or have otherwise proven inadequate.

6.      The pervasive unconstitutional conduct at St. Clair Prison also prompted an investigation in 2016 by the United States Department of Justice ("DOJ"), which culminated in an April 2019 report and a December 2020 lawsuit detailing repeated incidences of violence, violations of constitutional rights, utter indifference to the well-being of inmates, and recommended remedies.[1]

7.      These are in addition to the numerous lawsuits filed by the inmates themselves, who have been subjected to unconstitutional and unlawful conduct at St. Clair Prison.

8.      Plaintiff John McCarley ("McCarley") is, unfortunately, one of the recent victims at St. Clair Prison.

9.      Mr. McCarley arrived at St. Clair Prison in May 2019 as a low-risk inmate, classified as minimum custody under Alabama Department of Corrections ("ADOC") policies, meaning that he did not belong at a maximum-security facility like St. Clair Prison.

---

[1] *See infra* ¶ 95.

10.    The reason Mr. McCarley was transferred to St. Clair Prison was to attend a residential substance abuse treatment program, and the only one of its kind within ADOC at the time was located at St. Clair Prison.

11.    Mr. McCarley was not informed that in order to attend the only substance abuse treatment program available, he would be required to reside in a maximum-security prison. When he arrived at St. Clair Prison and realized it was a maximum-security facility, and that the low-risk drug treatment participants like Mr. McCarley were not adequately protected from the dangerous, high-risk inmate population, he immediately feared for his safety and sought a transfer. The officer presiding over the program informed Mr. McCarley that, if he dropped out of the program, he would be transferred to a minimum-security prison consistent with his low-risk classification. Mr. McCarley, accordingly, dropped out of the drug treatment program and expected to be transferred out of St. Clair Prison promptly, as the officer said he would be.

12.    But that did not happen. Defendants did not transfer Mr. McCarley from St. Clair Prison. Nor did they place him in administrative segregation for protection from dangerous inmates. Instead, Defendants placed Mr. McCarley in general population at St. Clair Prison, where they knew or should have known that he was at substantial risk of serious harm, and Defendants took no steps to protect him.

4

13.     Indeed, Mr. McCarley promptly complained to certain Defendants that he was in danger while in general population and requested to be transferred for his safety. Mr. McCarley's requests were not only ignored, he was mocked for making them. Defendant Derrick Dent, a Sergeant at St. Clair Prison, responded to one of Mr. McCarley's pleas for help by stating that they were going to "throw him to the wolves"—meaning that they would leave Mr. McCarley in general population, surrounded by high risk inmates, knowing he would be seriously harmed.

14.     And that is what happened. Within ***one week*** of Mr. McCarley being transferred to general population at St. Clair Prison, he was brutally attacked and stabbed multiple times by another inmate, who did not even belong in the same cell block as Mr. McCarley. Through their deliberate indifference, failure to supervise the facility, and failure to ensure that the appropriate safeguards were put in place or followed, Defendants allowed this inmate to improperly move freely from cell block to cell block. During the course of less than 24 hours, this violent inmate assaulted and stabbed five different inmates, including Mr. McCarley, who was left for dead on a common floor of the prison.

15.     Defendants Unknown Correctional Officers observed Mr. McCarley bleeding on the floor of the prison after the attack—during which he was stabbed in the chest, among other places—but refused to offer him aid, with one Defendant even stating: "I ain't going to get his blood all over me."

DOCSBHM\2353013\1

16.     Mr. McCarley survived the attack only because other inmates eventually rushed him to the prison infirmary for medical attention. He was then airlifted to a local hospital, where he received six-hours of open-heart surgery to save his life.

17.     None of this had to happen. If Defendants had (a) placed Mr. McCarley in administrative segregation after he dropped from the drug treatment program; (b) appropriately responded to Mr. McCarley's pleas for help or requests for a transfer; (c) appropriately supervised the facility; (d) prevented inmates from wandering from unit to unit unchecked; or (e) made an appropriate effort to confiscate contraband and weapons among the inmate population, Mr. McCarley would not have been attacked, and nearly killed, while in custody at St. Clair Prison.

18.     As detailed below, Defendants violated Mr. McCarley's constitutional rights. They knew he was at a substantial risk of serious harm in general population, yet they deliberately ignored his requests for help. They also failed to implement, or ensure that officers were following, appropriate procedures to avoid precisely this type of incident. The law requires more, and Mr. McCarley brings this lawsuit seeking relief for Defendants' violations of his constitutional rights.

## PARTIES

19.     Plaintiff John McCarley is a resident of the State of Alabama. He is currently incarcerated at Staton Correctional Facility in Elmore County, Alabama.

6

20.     Defendant Jefferson Dunn is a resident of the State of Alabama. He is, and at all times relevant to the Complaint was, the Commissioner of ADOC. The Commissioner is the highest ranking official in ADOC and is responsible for the direction, supervision, and control of ADOC.

21.     Defendant Steve Watson is a resident of the State of Alabama. At all times material hereto, Defendant Watson was employed by ADOC as Associate Commissioner for Plans and Programs. In this role, Defendant Watson is responsible for ensuring the effective and safe daily operations of ADOC prison facilities, including overseeing classification, data management, supervised reentry, religious programs, educational programs, and vocational programs.

22.     Defendant Jenny Abbott is a resident of the State of Alabama. At all times material hereto, Defendant Abbott was employed by ADOC as the Director of Facilities. In this role, Defendant Abbott is responsible for ensuring the effective and safe daily operations of ADOC prison facilities, including maintenance and repair of correctional facilities like St. Clair Prison.

23.     Defendant Arnaldo Mercado is a resident of the State of Alabama. At all times material hereto, Defendant Mercado was employed by ADOC as Chief Law Enforcement Officer. In this role, Defendant Mercado is responsible for ensuring the effective and safe daily operations of ADOC prison facilities, including criminal

DOCSBHM\2353013\1

investigations, intelligence gathering, and drug detection. He is also responsible for ensuring that ADOC correctional staff adhere to professional standards.

24.     Defendant Edward Ellington is a resident of the State of Alabama. At all times material hereto, Defendant Ellington was employed by ADOC as the Institutional Coordinator responsible for St. Clair Prison. In this role, Defendant Ellington is responsible for ensuring the effective and safe daily operations of prison facilities, including overseeing institutional security, staffing, Correctional Emergency Response Teams, the Classification Review Board, the Training Division, and the Transfer Division. Defendant Ellington is also responsible for serving as the liaison between St. Clair Prison and the ADOC Executive Leadership.

25.     Defendant Matthew C. Brand is a resident of the State of Alabama. At all times material hereto, Defendant Brand was employed by ADOC as the Associate Commissioner for Administrative Services. In this role, Defendant Brand was responsible for the training, development, and education of ADOC's workforce.

26.     Defendants Dunn, Watson, Abbott, Mercado, Ellington, and Brand are hereinafter referred to collectively as the "Administrative Supervisor Defendants."

27.     Defendant Karla Jones is a resident of the State of Alabama. Prior to and during the time that Mr. McCarley was at St. Clair Prison, Defendant Jones was employed as the Warden of St. Clair Prison. As Warden, Defendant Jones was responsible for the day-to-day operations of the prison, the safety and security of all

inmates at the prison, and the supervision of all other St. Clair Prison employees. Her responsibilities included, among other things, ensuring (a) adequate supervision and monitoring of inmates; (b) adequate staffing levels; (c) that appropriate protocols and procedures were implemented to protect inmates from violence at the prison; (d) that inmates were adequately classified and appropriately housed or assigned consistent with their risk profile and custody level; (e) that complaints and requests for transfer from inmates were appropriately documented and addressed; and (f) staff adherence to protocols.

28.   Defendant Errol Pickens is a resident of the State of Alabama. Prior to and during the time that Mr. McCarley was at St. Clair Prison, Defendant Pickens was employed as an assistant warden of St. Clair Prison. As an assistant warden, Defendant Pickens was responsible for the day-to-day operations of the prison, the safety and security of all inmates at the prison, and the supervision of all other St. Clair Prison employees. His responsibilities included, among other things, ensuring (a) adequate supervision and monitoring of inmates; (b) adequate staffing levels; (c) that appropriate protocols and procedures were implemented to protect inmates from violence at the prison; (d) that inmates were adequately classified and appropriately housed or assigned consistent with their risk profile and custody level; (e) that complaints and requests for transfer from inmates were appropriately documented and addressed; and (f) staff adherence to protocols.

9

29.     Defendant Nekitris Estelle is a resident of the State of Alabama. Defendant Estelle currently is, and at all times relevant to the Complaint was, employed as the head of classification at St. Clair Prison. As such, Defendant Estelle is responsible for ensuring the correct classification and housing of inmates at St. Clair Prison.

30.     Defendant Gary Malone is a resident of the State of Alabama. Defendant Malone currently is, and at all times relevant to the Complaint was, employed as a Captain at St. Clair Prison. As Captain, Defendant Malone is responsible for the day-to-day supervision of the correctional staff and ensuring the safety of St. Clair Prison.

31.     Defendant Kevin White is a resident of the State of Alabama. Defendant White currently is, and at all times relevant to the Complaint was, employed as a Captain at St. Clair Prison. As Captain, Defendant White is responsible for the day-to-day supervision of the correctional staff and ensuring the safety of St. Clair Prison.

32.     Defendant Carla Graham is a resident of the State of Alabama. Defendant Graham currently is, and at all times relevant to the Complaint was, employed as a Captain at St. Clair Prison. As Captain, Defendant Graham is responsible for the day-to-day supervision of the correctional staff and ensuring the safety of St. Clair Prison.

33.     Defendants Jones, Pickens, Estelle, Malone, White, and Graham are hereinafter referred to collectively as the "Facility Supervisor Defendants."

34.     Defendant Antoine Price is a resident of the State of Alabama. At all times relevant to the Complaint, Price was employed by ADOC as a Lieutenant at St. Clair Prison. As such, Defendant Price was responsible for the safety of all inmates at the prison and the supervision of all security activities and subordinate employees.

35.     Defendant Larry R. Baker is a resident of the State of Alabama. At all times relevant to the Complaint, Baker was employed by ADOC as a Lieutenant at St. Clair Prison. As such, Defendant Baker was responsible for the safety of all inmates at the prison and the supervision of all security activities and subordinate employees.

36.     Defendant Derrick Dent is a resident of the State of Alabama. At all times relevant to the Complaint, Defendant Dent was employed by ADOC as a Sergeant at St. Clair Prison. As such, Defendant Dent was responsible for the safety of all inmates at the prison and the supervision of all security activities and subordinate employees.

37.     Defendants Unknown Shift Commanders were the shift commanders on duty in N-block at St. Clair Prison from the date of Mr. McCarley's arrival through the date of his assault and stabbing on May 25, 2019. As shift commanders,

their responsibilities included, among other things, staffing the housing units, overseeing subordinates, ensuring that security checks were completed, and investigating and evaluating inmate complaints, concerns, and requests for transfer.

38.   Defendant Unknown Correctional Officer 1 was employed at St. Clair Prison during the time when Mr. McCarley was at the prison, and she was present with Defendants Baker and Dent at least once when Mr. McCarley complained that he had been improperly placed in general population and requested actions of Defendants to protect his safety.

39.   Defendant Unknown Correctional Officers 2 and 3 were employed at St. Clair Prison during the time when Mr. McCarley was at the prison, and their responsibilities included monitoring prison inmates and acting to ensure their safety while in custody. Defendant Unknown Correctional Officers 2 and 3 observed Mr. McCarley lying on the prison floor after being attacked but refused to render him aid.

40.   Defendants Price, Baker, Dent, Unknown Shift Commanders, and Unknown Correctional Officers 1-3 are hereinafter referred to collectively as the "Correctional Officer Defendants."

41.   The Administrative Supervisor Defendants, Facility Supervisor Defendants, and Correctional Officer Defendants are referred to herein collectively as "Defendants."

12

42.     Each of the Defendants is sued in his or her individual capacity and acted under the color of state law when engaging in the misconduct described herein.

## JURISDICTION AND VENUE

43.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(1)(2)-(3) because this action is brought under 42 U.S.C. § 1983, seeking relief for Defendants' violations of Mr. McCarley's constitutional rights. This Court also has jurisdiction over Mr. McCarley's state law claim pursuant to 28 U.S.C. § 1367(a).

44.     Venue appropriately lies in this judicial district under 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to Mr. McCarley's claims occurred within this judicial district.

## FACTUAL ALLEGATIONS

**A.      Defendants Wrongly Placed Mr. McCarley in General Population at St. Clair Prison.**

45.     Mr. McCarley entered ADOC custody on March 11, 2019 and reported to Kilby Correctional Facility for an initial evaluation, classification, and assignment.

46.     This is a standard ADOC process whereby inmates are supposed to be assigned a classification according to their risk profile.

47.     Mr. McCarley was classified as a low-risk inmate with "minimum-out" custody. According to the ADOC website, this classification means that Mr.

McCarley was deemed to "not pose a significant risk to [him]self or others" and that he was "suitable to be assigned off-property work details without the direct supervision of correctional officers."[2]

48.     Despite this low-level classification, ADOC transferred Mr. McCarley to serve his sentence at St. Clair Prison, which is classified as a "close custody" or maximum security correctional facility—the "most restrictive custody level to which an inmate can be assigned" according to the ADOC.[3]

49.     Mr. McCarley was sent to St. Clair Prison to participate in the Therapeutic Communities program, the only residential substance abuse treatment program in the Alabama state prison system at the time.

50.     Inmates participating in the residential substance abuse treatment program are supposed to be housed in a separate, safer area from St. Clair Prison's high-risk general population. This is due, at least in part, to protect the safety of low-risk inmate participants like Mr. McCarley. As discussed below, however, this policy was not followed, and dangerous high-risk general population inmates were permitted to freely interact with low-risk inmate participants in the drug treatment program at St. Clair Prison.

[2] *See* Ala. Dep't of Corr., *Definitions*, http://www.doc.state.al.us/Definitions (last visited April 8, 2021).
[3] *Id.*

14

51.     At the time Mr. McCarley agreed to enter the treatment program, and prior to arriving at St. Clair Prison, Mr. McCarley did not know he would have to go to a maximum-security prison to attend the program.

52.     Mr. McCarley arrived at St. Clair Prison in early May 2019 to begin the substance abuse treatment program.

53.     Upon arrival, he realized that he had been sent to a maximum-security prison. He also soon realized that, contrary to prison policy, Defendants and other officials at the prison were failing to properly supervise the facility and were allowing general population inmates to regularly interact with participants in the treatment program. Mr. McCarley rightly feared for his life and immediately sought a way out.

54.     The officer overseeing the drug treatment program told Mr. McCarley that, if he left the program, Mr. McCarley would be transferred out of St. Clair Prison due to his low-level custody status. The officer also told him that, while awaiting transfer to a lower custody facility, he would be placed in administrate segregation to ensure his safety for the interim period before he was transferred to another prison.

55.     Based on that understanding and to escape a dangerous place where he did not belong, Mr. McCarley dropped from the drug treatment program not long after arriving at St. Clair Prison. As a result, given his low-level custody status, Defendants should have ensured that Mr. McCarley was transferred out of St. Clair

15

Prison to a lower custody facility and that he was placed in administrative segregation to protect him while awaiting transfer. But, without any justification, Defendants failed to do so.

56.    Instead, on May 17, 2019, the Facility Supervisor Defendants and the Correctional Officer Defendants wrongly moved Mr. McCarley to cell N-2 in block N-1, which is a general population block at St. Clair Prison.

57.    St. Clair Prison's problems are especially severe in N-block, which is referred to as a "hot bay" by inmates and prison staff, including Defendants. "Hot bay" is a term used for housing units where a large proportion of inmates have had disciplinary problems and are commonly known to be prone to inmate-on-inmate violence. Upon information and belief, St. Clair Prison intentionally concentrates inmates with disciplinary problems in its "hot bays," but does not staff those blocks with additional officers, implement any additional safety procedures, or even follow the existing security procedures. According to his classification and history, Mr. McCarley should never have been placed in general population at St. Clair Prison, let alone placed in N-block, one of the most dangerous cell blocks in the prison.

**B.    Defendants Ignored Mr. McCarley's Pleas for Help and Requests for Transfer to Proper Housing.**

58.    It was immediately apparent that Mr. McCarley was in serious danger in general population. When he arrived at his cell, an inmate was already occupying

DOCSBHM\2353013\1

the cell and informed Mr. McCarley that he could not stay in the cell unless the block was locked down. The inmate threatened to harm Mr. McCarley if he stayed.

59.     Mr. McCarley promptly reported that he had been threatened with violence to Defendant Baker, Defendant Dent, and Defendant Unknown Correctional Officer 1. He also informed them that he was not supposed to be in general population based on his low-level classification and that he feared for his life in general population. He asked these Defendants to protect him by transferring him out of St. Clair Prison to a lower custody facility and to provide him with protective housing until the transfer was accomplished.

60.     These Defendants did not document or appropriately respond to Mr. McCarley's pleas and request for a transfer, as they were required to do. Rather, Defendant Dent taunted Mr. McCarley, telling him that they were going to "throw [him] to the wolves" and place him "in the toughest area in the camp."

61.     When Mr. McCarley persisted that the officers were required to look after his safety, Defendant Dent jumped up from his chair, took out his night stick, and ran Mr. McCarley out of the office.

62.     Because these Defendants refused to appropriately respond to Mr. McCarley's request, and given the serious threat of actual harm if he attempted to sleep in his assigned cell, Mr. McCarley was forced to sleep in the common dayroom of N-block, which put him at an additional, increased risk of harm.

63.     Upon information and belief, the Facility Supervisor Defendants and Correctional Officer Defendants were aware that Mr. McCarley was not supposed to be placed in general population at St. Clair Prison given his low-level custody status and that he was being forced to sleep in the dayroom at St. Clair Prison, all of which put him at a substantial risk of serious harm, but they did nothing to remedy the situation.

64.     In just one week, as Mr. McCarley was forced to sleep in the dayroom, he was threatened again by other inmates. One inmate told him that "talking the way he talked" was going to get him killed. Another inmate told him that someone had said they "had a white boy for sale," referring to Mr. McCarley.

65.     Mr. McCarley interpreted these and similar comments to mean that another inmate was offering to sell Mr. McCarley to inmates for sex. Mr. McCarley continued to receive similar warnings from fellow inmates that he was in serious danger during his brief stay in the dayroom.

66.     Given these continued threats, and the Correctional Officer Defendants' failure to respond to his initial pleas for help or request for a transfer, Mr. McCarley returned to the officers' desk on multiple occasions while still in general population to plead for help, reiterating that he was in fear for his life in general population. During this time, he also requested to be transferred to the faith/honor dorm within St. Clair Prison for his protection, which was supposed to

18

be separated from general population. He further requested, on multiple occasions, to speak with a supervisor regarding his safety concerns about being in general population. He received no response to any of the requests.

67.     Upon information and belief, the Facility Supervisor Defendants and Correctional Officer Defendants failed to take any action to address Mr. McCarley's requests for a transfer or his pleas for help to protect him from imminent harm in general population. Each time he returned to the officers' desk to ask for help, he was ignored and told to go away.

### C.      Due to Defendants' Deliberate Indifference, Mr. McCarley is Brutally Attacked and Stabbed.

68.     On May 25, 2019, after Mr. McCarley had been in general population for approximately one week, the substantial risk of harm that Mr. McCarley had feared—and warned the Correctional Officer Defendants of—came to pass.

69.     That afternoon, Mr. McCarley returned to N-block after mealtime and noticed that the doors to both sides of the block were open. Many inmates assigned to other housing blocks were in N-block without authorization.

70.     Mr. McCarley grew even more uneasy about his safety based on the open doors and uncontrolled access to the housing block.

71.     Mr. McCarley entered the block and started walking toward another inmate named Kelvin Moore to discuss GED classes. Before he could reach Mr. Moore, however, he was blindsided by an inmate who stabbed him in the chest.

72.     Mr. McCarley observed that his attacker appeared to be intoxicated.

73.     Mr. McCarley struggled with his attacker for a brief period, during which Mr. McCarley was stabbed in his right bicep and suffered other injuries from the attack.

74.     Mr. McCarley then tried to escape. He ran a short distance before collapsing at the bottom of the stairs, in a common area of N-block.

75.     After remaining unconscious for an unknown amount time, Mr. McCarley woke up in a cell immediately adjacent to the stairs, where someone had dragged him after he had collapsed and passed out. He was alarmed to see blood pulsating out of his chest.

76.     Defendant Unknown Correctional Officers 2 and 3 observed Mr. McCarley on the prison floor, bleeding from multiple injuries, but refused to render him any aid. One such Defendant even stated: "I ain't going to get his blood all over me."

77.     Upon information and belief, Defendant Unknown Correctional Officers 2 and 3 were going to leave Mr. McCarley there without assistance, letting him die on the prison floor.

78.     Two other inmates, however, ultimately intervened and carried Mr. McCarley to the prison infirmary.

79.     Mr. McCarley was then transferred to the University of Alabama Birmingham hospital, where he underwent a six-hour open heart surgery that saved his life. In fact, medical personnel at the hospital told Mr. McCarley that he "died" several times during the course of treatment and required multiple resuscitations.

**D.     Defendants' Deliberate Indifference Not Only Led to Mr. McCarley's Brutal Attack, but also Permitted Attacks on Other Inmates.**

80.     In addition to ignoring Mr. McCarley's requests for a transfer and pleas for help, the abject failure of the Facility Supervisor Defendants and the Correctional Officer Defendants to supervise the prison allowed the attack to occur.

81.     Mr. McCarley's attacker was not even assigned to the same block as Mr. McCarley. He was assigned to O-block (another "hot-bay") and should not have been permitted to move between the cell blocks. But that is what the Facility Supervisor Defendants and Correctional Officer Defendants wrongfully allowed to occur on the date of Mr. McCarley's attack through inadequate supervision.

82.     In fact, Mr. McCarley was not even the attacker's only victim that day.

83.     Prior to entering N-block where he attacked Mr. McCarley, the attacker stabbed other prisoners in his own block.

84.     The first stabbings occurred in a different cell block, where the Correctional Officer Defendants and other prison personnel observed, or were aware of, the incidents but did not intervene to stop the attack (or to prevent others). Indeed,

upon information and belief, the attacker was questioned by officers about one of the stabbings that occurred prior to Mr. McCarley's stabbing but was then simply returned to his cellblock without being searched for weapons (even despite the fact that the attacker appeared to be under the influence of drugs or alcohol at the time), and no security measures were imposed to prevent another attack.

85.    The attacker was then permitted to leave his cellblock and enter N-block without authorization, where he stabbed another inmate around the same time that he attacked Mr. McCarley. Again, the attack occurred without intervention from prison personnel.

86.    After multiple stabbings, the facility was finally locked down. Yet, even then, Mr. McCarley's attacker was allowed to enter another cell in N-block, even though he was assigned to a cell in O-block. While in that cell, the attacker stabbed Mr. Moore (the co-occupant of the cell) at least twelve times.

87.    In total, Mr. McCarley's attacker was able to stab two people in his own cell block, move freely to Mr. McCarley's cell block, stab two people (including Mr. McCarley) in that block, enter another cell in Mr. McCarley's block after lockdown, and stab a fifth person in that cell. All on the same day—without those in charge of the prison taking action to stop the attacks.

E.     **Mr. McCarley's Assault is Part of a Long History of Similar Inmate Violence at St. Clair Prison Arising from Defendants' Abject Failure to Implement and Abide by Appropriate Policies.**

88.     The conduct that led to Mr. McCarley's attack was not an isolated incident. It is part of an epidemic of violence at St. Clair Prison that has persisted for years due to the abject failure of Defendants (and other prison officials) to provide basic constitutional protections to the inmates in their custody.

89.     St. Clair Prison has long been known as one of the most dangerous and violent prisons in Alabama. Since 2010, reported assaults at St. Clair Prison have increased exponentially. For instance, in 2010, inmates reported 23 assaults; in 2011, 59 assaults; in 2012, 78 assaults; in 2013, 101 assaults; in 2014, 127 assaults; in 2015, 157 assaults; and in 2016, 249 assaults (meaning more than a ten-fold increase in the number of reported assaults over a period of six years).[4] From September 2018 to September 2019—the period in which Mr. McCarley was attacked—at least 280 Alabama prisoners suffered serious injuries, defined as requiring transport to outside hospitals, as the result of assaults.[5] And the numbers are likely much worse than these due to underreporting of inmate violence at St. Clair Prison.

---

[4] The alarming level of assaults has continued at St. Clair Prison, with 132 assaults reported in 2017, 163 assaults in 2018, and 97 assaults in 2019.

[5] *See U.S. v. State of Alabama, et al.*, Case No. 2:20-cv-01971-JHE, Dkt. 1 (N.D. Ala.) ("DOJ Complaint").

23

90.     A nationally recognized corrections expert, Steve J. Martin, previously examined the conditions at St. Clair Prison and opined in a 2016 report: "The frequency of assaults resulting in life-threatening injuries is quite simply among the highest I have observed in my 43-year career in corrections."[6]

91.     Because of the epidemic of violence at St. Clair Prison and other Alabama state correctional facilities, the DOJ opened a Civil Rights of Institutionalized Persons Act Investigation in October 2016 (the "DOJ Investigation"). The DOJ issued a report of its findings on April 2, 2019, detailing incidents of assaults and murders at St. Clair Prison.[7]

92.     The DOJ Investigation revealed an incredible amount of violence and proliferation of contraband at St. Clair Prison, as well as dangerous levels of understaffing and violations of prison policies that allowed the proliferation to occur. The DOJ Investigation provided further notice to Defendants that, among other things, inmates at St. Clair Prison faced an increased risk of violence due to Defendants' failure to prevent weapons and other contraband from entering the

---

[6] *See* Campbell Robertson, *An Alabama Prison's Unrelenting Descent into Violence*, N.Y. Times, March 28, 2017, https://www.nytimes.com/2017/03/28/us/alabama-prison-violence.html.

[7] *See* United States Dep't of Justice, Civil Rights Div., *Investigation of Alabama's State Prisons for Men*, April 2, 2019, https://www.justice.gov/crt/case-document/file/1149971/download. Attached hereto as Exhibit A.

prison, the overcrowding present at the prison, Defendants' lax security protocols, and Defendants' failures to properly classify and house inmates at St. Clair Prison.

93.     For example, the DOJ Investigation indicated that between November 2015 and Mr. McCarley's stabbing on May 25, 2019, there were at least 147 documented assaults on inmates at St. Clair Prison that included weapons, an average of at least one violent assault every 8.8 days for over three years. The rate of assaults at St. Clair Prison far exceeded typical levels of violence at comparable facilities across the nation.

94.     The DOJ Investigation also found reasonable cause to believe that the ADOC was not recording all violent events in incident reports, meaning that it was possible, and perhaps likely, that the violence at St. Clair Prison was greater than what the above statistics show. But even with this suspected gap in records, the DOJ found that the available incident reports demonstrated a strong pattern of evidence of deficient supervision and a systemic failure across ADOC institutions to provide humane conditions and confinement and take reasonable measures to guarantee inmate safety.

95.     Following the DOJ Investigation, in December 2020, the United States of America filed suit against the State of Alabama and the ADOC for violations of the Eighth and Fourteenth Amendment rights of Alabama prisoners resulting from

the defendants' failure to prevent prisoner-on-prisoner violence. *See* DOJ
Complaint.

96.    The DOJ Complaint notes that "[s]ince the Spring of 2019"—when the
DOJ issued its report from the investigation—"the State of Alabama has failed or
refused to correct the unconstitutional conditions in Alabama's prisons for men." *Id.*
¶ 3.

97.    These very same failures led to the brutal attack on Mr. McCarley.

98.    Specifically, inmates at St. Clair Prison have for years experienced
extreme and sometimes lethal violence at the hands of other inmates because of the
failure of Defendants and other prison personnel to: (a) properly house inmates
according to their classification; (b) document and respond to inmate complaints and
pleas for help; (c) appropriately staff and supervise inmates; (d) prevent
unauthorized inmate movement in the prison; and (e) confiscate contraband and
dangerous weapons.

### 1. The Failure to Properly Classify and House Inmates Was a Known Risk to Inmate Safety at St. Clair Prison.

99.    Upon information and belief, at the time that Mr. McCarley was
assigned to general population at St. Clair Prison, Defendants were well aware of
the history of violence at St. Clair Prison, that Mr. McCarley did not belong in
general population, and that he was at a substantial risk of serious harm in general
population.

DOCSBHM\2353013\1

100.   Ineffective and unsafe housing assignments were one of the findings in the DOJ Investigation. The DOJ explained that the failure to implement effective classification and housing policies resulted in violence by commingling prisoners who ought to be kept separate within the same, under-supervised housing units.[8]

101.   This is precisely what occurred in Mr. McCarley's case.

102.   But, upon information and belief, Defendants were well aware of this issue even before the DOJ Investigation from the multiple well-documented incidents of violence caused by improper classification and housing assignments.

103.   For example, in May 2016, Emory Cook was killed in L-block the same day he was placed in general population from restricted housing, where he had been placed for protective reasons after a serious stabbing.

104.   In December 2017, Aundria Boykins—who, like Mr. McCarley, was participating in the residential drug program at St. Clair Prison—was stabbed in the honor dorm by a general population inmate who was not supposed to have access to the dorm. A correctional officer witnessed parts of the assault but did nothing to intervene. Mr. Boykins spent two days in the hospital following the attack.

105.   Defendants, in particular the Administrative Supervisor Defendants and the Facility Supervisor Defendants, exhibited deliberate indifference by continuing

---

[8] *See id.* at 26.

DOCSBHM\2353013\1

to ignore the dangers to inmates, like Mr. McCarley, who were improperly classified and dangerously placed in general population at St. Clair Prison.

106.   Had Defendants taken the simple action of implementing effective classification and housing policies, the attack on Mr. McCarley would never have occurred.

### 2. There Exists a Well-Documented Pattern of Inmate Attacks Following Unanswered Complaints and Pleas for Help.

107.   Compounding Defendants' failure to properly classify and house inmates, Defendants also turned a blind eye to inmates' complaints regarding their safety. This, too, is well-documented as an integral part of the history of violence at St. Clair Prison.

108.   For example, Nakie Echols was stabbed in September 2015 in the dayroom of P-block, where he was forced to sleep due to threats from another prisoner. Prior to being stabbed, Mr. Echols had asked to be reassigned to another dorm. Mr. Echols was hospitalized for five days.

109.   In May 2016, Jaime Chavez reported being subjected to extortion and subsequently stabbed. Mr. Chavez twice informed officers that he was under threat, but the officers did not respond. Mr. Chavez was assaulted two additional times before his nose was broken and he was moved to segregation.

110.   In July 2017, Joseph Wood was found dead in his cell at St. Clair Prison of manual strangulation. Prior to his death, Mr. Wood had expressed to guards his

fears of being assaulted and the lack of security or supervision in the section of the prison in which he was housed. But he was not moved before being killed.

111.   The DOJ Investigation uncovered numerous similar instances where prisoners who had explicitly informed prison officials that they feared for their safety were later killed or assaulted.

112.   This history demonstrates Defendants' knowledge of the extreme danger to inmates presented by ignoring pleas for help—which are a warning sign of violence to come. Yet, Defendants allowed this conduct to persist and Mr. McCarley's pleas for help went unanswered.

### 3. Defendants' Failure to Appropriately Staff and Supervise Prison Personnel Has Allowed Violence to Persist at St. Clair Prison Unchecked.

113.   Severe understaffing at St. Clair Prison and throughout the ADOC also exposes inmates to serious harm.

114.   For fiscal year 2017, ADOC reported "critical levels of authorized staffing shortages."[9] In February 2019—just months before the attack on Mr. McCarley—ADOC acknowledged that it needed to hire over 2,000 correctional officers and 125 supervisors in order to adequately staff its men's prisons.

115.   These staffing failures were reflected in the extremely lacking supervision of inmates at St. Clair Prison.

---

[9] *See id*. at 11.

116.   The DOJ Investigation, for example, revealed numerous instances where tired and overworked correctional officers were not showing up for work or were refusing to work mandated overtime. It also found incident reports of correctional officers sleeping in the "cube" while on duty or sleeping in the hospital or perimeter security vehicles.

117.   The DOJ Complaint also notes that a "factor contributing to the violence [at Alabama prisons] is the dangerously low level of security staffing."

118.   The failure to staff and supervise has led to countless incidents of violence at St. Clair Prison.

119.   For instance, in 2013, a prisoner was stabbed multiple times with an ice pick outside the gym by another prisoner. At the time, there were approximately 200 prisoners in the area, but no officers were present to intervene in the conflict. The guards did not intervene even to render medical aid after the attack; the prisoner had to make his own way to the medical staff who sent him via ambulance to an outside hospital.

120.   In September or October 2014, another inmate, Christopher Chapple, was beaten over the course of several hours by multiple assailants in Q-block. There was only a single officer in the block, a cadet, who never came out of the "cube" monitoring station during Mr. Chapple's assault, nor called for other officers to assist as the beating continued.

121.   In September 2018, Terry Pettiway was fatally stabbed. At the time of his attack, only one roving officer was assigned to monitor eight prison blocks.

122.   These are just a few examples of the woefully deficient staffing at St. Clair Prison that has allowed this violence to grow.

123.   Upon information and belief, Defendants were aware of this understaffing and the substantial risk of serious harm that it posed to inmates before Mr. McCarley arrived at St. Clair Prison.

### 4. Defendants are Aware that Improper Inmate Movement Among the Prison Contributes to the Pattern of Violence at St. Clair Prison.

124.   Defendants' failure to appropriately staff and supervise inmates also gives rise to another well-documented policy violation within St. Clair Prison: inmates frequently wander unchecked from housing unit to housing unit without staff intervention.

125.   Based on a review of incident reports from 2017, the DOJ Investigation revealed over 1,100 incidents of prisoners being in an unauthorized location.

126.   These incident reports are more than enough to put the Administrative Supervisor Defendants and the Facility Supervisor Defendants on notice of the severe risk posed to inmates from understaffing and allowing inmates to wander among separate housing units.

127.   Indeed, the history of violence at St. Clair Prison resulting from inmates wandering the prison unchecked was well documented long before Mr. McCarley's attack. Many of these prior incidents are similar to the circumstances of Mr. McCarley's incident.

128.   In June 2014, an inmate, Mr. White, was assaulted in the hallway between P and Q-blocks by a prisoner who, upon information and belief, was not assigned to either block. There were no officers present when Mr. White was assaulted. He was strangled and then dragged while unconscious into the showers in Q-block. He remained in the showers from approximately 7:30 a.m. until 1:00 p.m. and was never found by staff.

129.   In December 2014, Michael Stamper—who was assigned to a block containing prisoners over 40 with a clean six-month record—was stabbed in the dayroom by a young prisoner with a history of violence who should not have been allowed in Mr. Stamper's block. Mr. Stamper was stabbed at least eight times in the head and neck, requiring an extensive inpatient stay at the hospital.

130.   In January 2015, Elliott Blount was robbed and stabbed in his cell in N-block. Mr. Blount's assailant was assigned to P/Q block yet was allowed to enter an unassigned living area. Mr. Blount suffered severe head injuries that required extensive surgery at the hospital.

131.   In February 2015, Brandon Ladd was stabbed during an attempted robbery in his cell in L-block by an inmate assigned to a different block, who was nonetheless allowed to freely enter his block. Mr. Ladd suffered stab wounds to his forearm and chest, resulting in a collapsed lung, which required extensive treatment, including surgery, at the hospital.

132.   In May 2015, Victor Russo was robbed and assaulted by assailants who were allowed to enter the block even though they were assigned to a different block. The assailants were armed with knives and Mr. Russo likewise required hospital treatment.

133.   The list goes on. Examples of other attacks at St. Clair Prison have been detailed in numerous reports, newspaper articles, and several prior lawsuits filed against the Administrative Supervisor Defendants, Facility Supervisor Defendants, and others.[10]

### 5.   Defendants Ignored the Proliferation of Contraband Weapons at St. Clair Prison.

134.   The risk and culture of violence at St. Clair Prison also has been fueled by Defendants, including the Administrative Supervisor Defendants and the Facility Supervisor Defendants, tolerating and condoning violence by officers and staff

---

[10] *See, e.g.*, *McGregor v. Thomas, et al.*, No. 4:17-cv-593-SGC (N.D. Ala.); *Duke et al. v. Dunn, et al.*, No. 4:14-cv-1952-VEH (N.D. Ala.); *Wood v. Dunn, et al.*, No. 2:19-cv-511-MHT-WC (N.D. Ala.).

DOCSBHM\2353013\1

members or failing to discipline inmates for violent acts—which has allowed staff to willfully violate prison policy and smuggle contraband into St. Clair Prison, enabling widespread corruption among officers.

135.   These failures—including the failure to discipline inmates for violence, or even to discipline officers for excessive force—signaled to inmates at St. Clair Prison that they could abuse and assault other inmates without fear of consequences.

136.   Notwithstanding ADOC's purported "zero-tolerance" policy for weapons,[11] at the time of Mr. McCarley's assault, it was common knowledge among staff at St. Clair Prison that the inmate population was heavily armed and that some prison personnel actually encouraged inmates to obtain and use weapons.

137.   On a regular basis, health care professionals in St. Clair Prison's infirmary saw stab wounds, such as the wounds Mr. McCarley received.

138.   In the words of former correctional officer Jonathan Truitt in a January 2017 article, a single 24-person cell block at St. Clair Prison could contain "30 to 40" contraband knives; contraband was "out of control;" and inmates were "being assaulted in every way imaginable."[12]

---

[11] *Alabama Department of Corrections Identifies Illegal Contraband at Holman and Tutwiler Correctional Facilities, Makes Arrests*, News 5 WKRG (Jan. 24, 2020), https://www.wkrg.com/alabama-news/alabama-department-of-corrections-identifies-illegal-contraband-at-holman-and-tutwiler-correctional-facilities-makes-arrests/

[12] *See* Bryan Lyman, *Alabama Corrections Officers' Ranks Drop 20 Percent*, Montgomery                Advertiser                (Jan.        7,        2017),

139.   Between 2015 and 2017, prison personnel found ammunition and firearms at least three times at St. Clair Prison.

140.   Prisoner-made weapons are also common throughout the prison. One former correctional officer, David Ellis, recalls seeing knives made out of vent slats, ice picks sharpened from copper plumbing rods, and homemade zip guns fashioned with a wooden block, a nail, rubber bands, and a bullet.

141.   Mr. Ellis even recalled an encounter with an inmate carrying a sword inside of St. Clair Prison in 2017. Mr. Ellis stepped into the G-Gate "guard shack," and two minutes later an inmate was standing pointing a sword toward Mr. Ellis's chest.

142.   Upon information and belief, the Administrative Supervisor Defendants and Facility Supervisor Defendants were aware of, but did nothing to curtail, the widespread availability of contraband weapons at St. Clair Prison, exhibiting deliberate indifference to inmates such as Mr. McCarley who were likely to be victimized by such weapons.

143.   Instead, these Defendants fostered and enabled the accumulation of weapons through at least two practices: (a) inadequate search procedures; and (b) inappropriate responses when weapons were recovered.

---

https://www.montgomeryadvertiser.com/story/news/politics/southunionstreet/2017/01/08/alabama-corrections-officers-ranks-drop-20-percent/95762920/.

DOCSBHM\2353013\1

144.   Security staff at St. Clair Prison did not regularly conduct prison-wide searches and other standard prison search protocols and procedures to root out contraband. The Administrative Supervisor Defendants and the Facility Supervisor Defendants turned a blind eye to noncompliance with search protocols.

145.   When officers did recover weapons from inmates, they responded with indifference, often declining to discipline inmates found with knives or other contraband weapons.

146.   The Administrative Supervisor Defendants' and Facility Supervisor Defendants' failure to ensure that inmates were disciplined for possession of weapons created a dangerous culture whereby inmates knew they could possess weapons with impunity and felt emboldened to use those weapons without fear of incurring disciplinary citations.

**F.    Defendants Were Aware of and Have Systematically Failed to Address the Dangerous Conditions at St. Clair Prison Placing Inmates at a Severe Risk of Serious Violence.**

147.   Upon information and belief, at the time Mr. McCarley was placed in general population at St. Clair Prison, Defendants knew of the dangerous conditions that ultimately led to Mr. McCarley's attack. That includes being aware of the deficiencies in prison operations and prior incidents discussed above, including the presence of contraband at St. Clair Prison, all of which put them on notice of the grave risk to Mr. McCarley at St. Clair Prison—a risk that they willfully ignored.

36

148.   The Administrative Supervisor Defendants and the Facility Supervisor Defendants, for instance, routinely review incident reports, Investigations & Intelligence reports, duty officer reports, disciplinary records, medical records, annual monthly ADOC data reports, and inmate progress reports that detail the rampant violence at St. Clair Prison.

149.   Murders at St. Clair also receive constant media coverage, which include responses from ADOC spokespersons.

150.   In addition, the violent conditions at St. Clair Prison have been the subject of multiple lawsuits against the Administrative Supervisor Defendants and the Facility Supervisor Defendants, among others. These lawsuits consistently allege that inmates face a serious and immediate security risk at St. Clair Prison because of the proliferation of contraband weapons and a lack of supervision by prison personnel and monitoring of inmates, among other deficiencies.

151.   In October 2014, the Equal Justice Initiative ("EJI") filed a class action complaint in the *Duke* Litigation detailing the epidemic of violence overtaking St. Clair Prison and the poor leadership, mismanagement, and inadequate policies and procedures responsible for its rise.[13]

152.   Specifically, the class action plaintiffs in the *Duke* Litigation alleged that that "mismanagement, poor leadership, overcrowding, inadequate security, and

---

[13] *See Duke*, Case No. 4:14-cv-1952 (N.D. Ala.), Dkt. No. 1.

unsafe conditions . . . ha[d] led to an extraordinarily high homicide rate, weekly stabbings and assaults, and a culture where violence is tolerated," which created conditions of confinement violating the Eighth and Fourteenth Amendments.[14]

153.   The *Duke* plaintiffs also alleged that ADOC and St. Clair Prison officials failed to promulgate, implement, and enforce the policies and procedures necessary to adequately supervise the facility and maintain the safety and security of the inmates.

154.   During the course of the *Duke* Litigation, Defendant Dunn remarked that St. Clair Prison "stood out" due to its violence and that it remained an "ongoing concern."[15] Defendant Dunn explained that the severity of the understaffing—with St. Clair Prison only having 57% of the staff it needed at the time—created a situation in which correctional officers were expected to perform beyond the scope of their training.

155.   Additionally, in April 2016, a St. Clair Prison correctional officer discussed the level of danger present at the prison on condition of anonymity.[16]

---

[14] Second Am. Compl. at 1, *Duke*, No. 4:14-cv-01952, Dkt. 53.

[15] Lauren Walsh, *ADOC Commissioner: Overcrowding, understaffing breeding violence at St. Clair Prison*, ABC 33/40 (Dec. 10, 2015), https://abc3340.com/news/local/adoc-commissioner-overcrowding-understaffing-breeding-violence-at-st-clair-prison.

[16] Clare Huddleston, *EXCLUSIVE: St. Clair Correctional Officer talks to WBRC about prison issues*, WBRC FOX6 News (Apr. 7, 2016), https://www.wbrc.com/story/31672139/exclusive-st-clair-correctional-officer-talks-to-wbrc-about-prison-issues/.

During his interview, the officer explained that for any given shift, only three to ten correctional officers actively patrolled the prison. And because all of the other officers were required to stay at their posts, only these three to ten "roving" officers could respond to various incidents around the prison, such as the stabbing that occurred here. Later, Defendant Dunn characterized ADOC prisons as the most overcrowded and noted that it would not "be long until we're the most understaffed and most violent."[17]

156.   In 2017, the ADOC reached a settlement with the *Duke* Litigation plaintiffs through which it promised to institute certain reforms. This included, among other things, commitments to: (a) implement an internal classification system that would protect incarcerated people and prison staff by ensuring that individual's risks and needs are taken into account when assigning them to housing and programs; (b) create an incident management system to help prison officials prevent, track, and respond to violent incidents; and (c) significant structural reforms intended to protect incarcerated people with safety needs.

157.   In the years since the settlement of the *Duke* Litigation, however, the Administrative Supervisor Defendants, Facility Supervisor Defendants, and the ADOC have failed to institute these reforms at St. Clair Prison or have failed to

---

[17] Campbell Robertson, *An Alabama Prison's Unrelenting Descent Into Violence*, N.Y. TIMES (Mar. 28, 2017), https://www.nytimes.com/2017/03/28/us/alabama-prison-violence.html.

ensure that any reforms were appropriately implemented and followed. As a result, the failures at St. Clair Prison have continued and, in June 2018, only eight months after reaching the settlement, the parties in the *Duke* Litigation returned to mediation.

158.   The DOJ Investigation report released in April 2019 (more than a month before Mr. McCarley's attack) further demonstrates Defendants' knowledge of the violence, contraband, corruption, and substantial risk of harm to inmates at St. Clair Prison.

159.   Despite a long history of notice of the substantial risk of violence facing inmates at St. Clair Prison, the Administrative Supervisor Defendants and the Facility Supervisor Defendants deliberately failed to take appropriate steps to address and reduce the risk of violence—even when ADOC agreed to do so to settle the *Duke* Litigation.

160.   The Administrative Supervisor Defendants and Facility Supervisor Defendants have intentionally, or at least through deliberate indifference, allowed this epidemic of violence to occur through a practice and policy that includes, among other things, woefully understaffing the prison and failing to ensure that inmates were appropriately housed and monitored, that complaints or threats were appropriately documented and addressed, and that attackers were appropriately disciplined.

40

161.   As Warden of St. Clair Prison, Defendant Jones was well aware of the violence and security challenges at St. Clair Prison, through her access to institutional reports, media reports, and her observations at the prison. But as with the other Administrative Supervisor Defendants and Facility Supervisor Defendants, Defendant Jones failed to take corrective action to improve safety at St. Clair Prison or to appropriately supervise the personnel for which she was responsible.

162.   Due to all of these failures, the violence at St. Clair Prison continues today, with nearly all of the inadequate policies and procedures still in place.[18]

### COUNT I
### 42 U.S.C. § 1983 CLAIM
### VIOLATION OF THE EIGHTH AMENDMENT
### AGAINST CORRECTIONAL OFFICER DEFENDANTS

163.   Mr. McCarley hereby adopts paragraphs 1-162 as if set forth fully herein.

164.   Mr. McCarley brings this claim against the Correctional Officer Defendants for depriving him of his right to be free from known and unreasonable risk of serious harm while in ADOC custody in violation of the Eighth Amendment to the United States Constitution.

---

[18] There is no grievance procedure for Mr. McCarley through St. Clair Prison or the ADOC to address the issues and complaints raised herein.

165.   The Correctional Officer Defendants, while acting under the color of state law, intentionally, willfully, recklessly, or with deliberate indifference deprived Mr. McCarley of his Eighth Amendment rights.

166.   Additionally, the Correctional Officer Defendants' conduct described above violated Mr. McCarley's clearly established constitutional rights, including his right to be protected from physical assault by other inmates.

167.   The Correctional Officer Defendants showed deliberate indifference, malice, willfulness, and/or recklessness to Mr. McCarley's rights, safety, and well-being. Their conduct was objectively unreasonable.

168.   Due to the history of violence at St. Clair Prison, Mr. McCarley's low-level custody classification, the frequency with which Mr. McCarley reported threats to his life during his short stay in general population, and Mr. McCarley's express complaints to the Correctional Officer Defendants regarding his risk of harm, these Defendants subjectively knew Mr. McCarley faced a substantial risk of serious harm in general population at St. Clair Prison.

169.   The Correctional Officer Defendants disregarded this known risk by failing to respond in an objectively reasonable manner, including but not limited to failing to transfer Mr. McCarley to a lower-level custody facility and to place him in administrative segregation (or an alternative safe living environment) to protect him pending transfer.

42

170.   The Correctional Officer Defendants further violated Mr. McCarley's constitutional rights by failing to monitor the prison and prevent the widespread availability of contraband among inmates, all of which allowed Mr. McCarley's attacker to move freely between cell blocks and attack multiple victims, including Mr. McCarley, on the same day.

171.   As a proximate result of the Correctional Officer Defendants' failures, including their failure to properly secure St. Clair Prison and their failure to transfer Mr. McCarley or remove Mr. McCarley from general population, Mr. McCarley was nearly killed by a fellow inmate who was not even supposed to be in Mr. McCarley's cell block.

**COUNT II**
**42 U.S.C. § 1983 CLAIM**
**VIOLATION OF THE EIGHTH AMENDMENT**
**AGAINST UNKNOWN CORRECTIONAL OFFICERS 2 AND 3**

172.   Mr. McCarley hereby adopts paragraphs 1-162 as if set forth fully herein.

173.   Mr. McCarley brings this claim against Unknown Correctional Officer Defendants 2 and 3 for depriving him of his right to adequate medical care while in ADOC custody in violation of the Eighth Amendment to the United States Constitution.

174.   Mr. McCarley faced a substantial risk of harm based on a serious medical need as he bled out on the floor of the prison after the stabbing.

175.   Despite clearly observing him in this state of serious medical need, Unknown Correctional Officers 2 and 3 failed to transport Mr. McCarley to the prison infirmary for treatment or to provide him any assistance at all.

176.   Unknown Correctional Officers 2 and 3 knew of Mr. McCarley's substantial risk of harm when they observed Mr. McCarley lying on the floor of the prison after the attack. They thus had both subjective and objective knowledge of Mr. McCarley's serious medical need, yet they failed to reasonably act to respond to that need.

177.   Unknown Correctional Officers 2 and 3 acted with deliberate indifference to Mr. McCarley's serious medical need by failing to transport him to the infirmary for treatment or to provide him any assistance.

178.   The conduct of Unknown Correctional Officers 2 and 3 described above violated Mr. McCarley's clearly established constitutional right to adequate medical care while in ADOC custody.

**COUNT III**
**42 U.S.C. § 1983 CLAIM**
**VIOLATION OF THE EIGHTH AMENDMENT**
**AGAINST THE ADMINISTRATIVE AND FACILITY SUPERVISOR**
**DEFENDANTS**

179.   Mr. McCarley hereby adopts paragraphs 1-162 as if set forth fully herein.

180.   The Administrative Supervisor Defendants and the Facility Supervisor Defendants failed to take reasonable measures to protect Mr. McCarley from violence at the hands of other St. Clair Prison inmates, which caused Mr. McCarley's injuries.

181.   Upon information and belief, the Administrative Supervisor Defendants and the Facility Supervisor Defendants knew of and consciously disregarded the substantial risk that Mr. McCarley would be seriously injured while in custody. They failed to protect him from this harm.

182.   The Administrative Supervisor Defendants and the Facility Supervisor Defendants disregarded this known risk by failing to respond in an objectively reasonable manner, including but not limited to failing to enact or follow reasonable policies and procedures designed to provide adequate security and supervision, to ensure that inmates were appropriately housed in accordance with their custody level, and to ensure that complaints or threats were appropriately documented and addressed.

183.   Additionally, upon information and belief, the Administrative Supervisor Defendants and the Facility Supervisor Defendants knew of numerous prior incidents of similar violence, including prior instances of violence against prisoners, like Mr. McCarley, who should never have been placed in general population at St. Clair Prison in the first place.

45

184.   Nonetheless, the Administrative Supervisor Defendants and the Facility Supervisor Defendants were deliberately indifferent to the substantial risk of harm to Mr. McCarley by, among other things, failing to implement appropriate policies and procedures to prevent these incidents or, if implemented, failing to ensure that such policies and procedures were appropriately followed and that violations were appropriately addressed. The Administrative Supervisor Defendants and the Facility Supervisor Defendants additionally failed to train their reports as necessary to prevent exactly the type of injuries suffered by Mr. McCarley.

185.   The Administrative Supervisor Defendants and the Facility Supervisor Defendants' deliberate indifference to the substantial risk of harm to inmates at St. Clair prison directly and proximately caused Mr. McCarley's injuries.

186.   The conduct of the Administrative Supervisor Defendants and Facility Supervisor Defendants described above was objectively unreasonable and violated Mr. McCarley's clearly established constitutional rights, including his right to be protected from physical assault by other inmates.

**COUNT IV**
**STATE LAW**
**NEGLIGENCE**
**AGAINST ALL DEFENDANTS**

187.   Mr. McCarley hereby adopts paragraphs 1-162 as if set forth fully herein.

188.   Defendants are also liable under state-law negligence principles for Mr. McCarley's injuries.

189.   Defendants owed Mr. McCarley a duty of reasonable care to protect him from foreseeable harm while in ADOC custody.

190.   Upon information and belief, Defendants knew that, given his low custody level, Mr. McCarley was in risk of serious harm in general population at St. Clair Prison. Indeed, Mr. McCarley specifically warned several Defendants on multiple occasions that he was at risk for the exact type of harm he eventually suffered.

191.   Rather than conform their conduct to the applicable standard of care, Defendants acted with gross negligence, willfully, maliciously, fraudulently, wantonly, or in bad faith to transfer Mr. McCarley or otherwise protect him from harm.

192.   Mr. McCarley's injuries were proximately caused by Defendants' negligence, which breached the standard of care.

WHEREFORE, Plaintiff John McCarley respectfully requests that this Court:

(a) award compensatory damages against Defendants, jointly and severally, in an amount to be determined at trial;

(b) award punitive damages against Defendants, jointly and severally;

(c) award reasonable attorneys' fees and expenses of litigation;

and

(d) award any other relief the Court deems just and equitable.

Respectfully submitted,

*/s/ J.S. "Chris" Christie, Jr.*
J.S. " Chris" Christie, Jr.(ASB-3162-H07J)
Gaile P. Gratton (ASB-9988-r63g)
Alyse N. Windsor (ASB -8902-V72C)
**SIROTE & PERMUTT, P.C.**
2311 Highland Avenue South
Post Office Box 55727
Birmingham, AL 35255-5727
Telephone:  (205) 930-5100
Facsimile:   (205) 930-5101
cchristie@sirote.om
ggratton@sirote.com
awindsor@sirote.com

Brandon R. Keel
(*pro hac vice* forthcoming)
Charles Spalding, Jr.
(*pro hac vice* forthcoming)
**KING & SPALDING LLP**
1180 Peachtree Street, N.E.
Atlanta, GA  30309
Telephone:  (404) 572-4600
Facsimile:   (404) 572-5100
bkeel@kslaw.com
cspalding@kslaw.com

Julia C. Barrett
(*pro hac vice* forthcoming)
**KING & SPALDING LLP**
500 W. 2nd Street, Suite 1800

48

Austin, TX 78701
Telephone:  (512) 457-2000
Facsimile:   (512) 457-2100
jbarrett@kslaw.com

Attorneys for Plaintiff