

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

JOHN MCCARLEY,          )

    Plaintiff,        )

                )

v.                 )      **4:21-cv-570-LSC**

JEFFERSON DUNN, *et al.*,    )

    Defendants.    )

## MEMORANDUM OF OPINION

Plaintiff John McCarley brings this action against fourteen current and former Alabama Department of Corrections ("ADOC") employees in their individual capacities, alleging constitutional violations under 42 U.S.C. § 1983 and negligence under Alabama law. (Doc. 91 ¶ 38.) Before the Court are motions to dismiss filed by all Defendants. (Docs. 93, 95, 104.) The motions have been fully briefed and are ripe for review. For the reasons stated below, the motions are due to be **DENIED**.

## I.    Background[1]

---

[1]    In evaluating a motion to dismiss, this Court "accept[s] the allegations in the complaint as true and constru[es] them in the light most favorable to the plaintiff." *Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1275 (11th Cir. 2012) (quoting *Ironworkers Loc. Union 68 v. AstraZeneca Pharm., LP*, 634 F.3d 1352, 1359 (11th Cir. 2011)). The following facts are, therefore, taken from the allegations contained in McCarley's Second Amended Complaint, and the Court makes no ruling on their veracity.

In May of 2019, McCarley was stabbed and nearly murdered by a fellow inmate in the "hot bay" at St. Clair Correctional Facility. McCarley claims that his attack was the result of a prison environment pervaded by inmate-on-inmate violence and enabled by the deliberate indifference of those in charge.

## A. McCarley was stabbed by another inmate at St. Clair, where he attended a substance abuse treatment program.

ADOC classified McCarley as a low risk, "minimum-out" custody inmate, meaning he did "not pose a significant risk to [him]self or others," and he could be assigned to off-property work details without the direct supervision of correctional officers. (Doc. 91 ¶ 43.) Two months into his incarceration, McCarley transferred to St. Clair to attend the only substance abuse treatment program then operating within ADOC. (*Id.* ¶¶ 10, 41, 45.)

St. Clair is a maximum-security correctional facility—the most restrictive class of prison to which an inmate can be assigned. (*Id.* ¶ 44.) It houses inmates designated as maximum custody based on their histories of violence and potential for future violence. (*Id.*) As a minimum custody inmate, McCarley would not have been sent to St. Clair but for his participation in the substance abuse treatment program. (*Id.* ¶ 9.) He did not realize that he would be sent to St. Clair when he joined the program. (*Id.* ¶¶ 11, 47.)

When he arrived at St. Clair, McCarley "immediately feared for his safety and sought a transfer." (*Id.* ¶¶ 11, 49.) He learned from an officer in charge of the treatment program that, if he dropped out of the program, ADOC policy required his prompt transfer out of the prison. (*Id.* ¶¶ 11, 50–51.) So, he dropped out. (*Id.* ¶¶ 11, 51.) But McCarley was not transferred out of St. Clair. (*Id.* ¶ 12.) Nor was he placed in administrative segregation—a separate area away from high-risk inmates—as ADOC policy required for participants in the substance abuse program. (*Id.* ¶¶ 12, 46, 57.) Instead, he was housed in the "hot bay." (*Id.* ¶¶ 12, 52.) He describes the hot bay as an area within St. Clair where "inmates with disciplinary problems were intentionally concentrated" without any additional security. (*Id.* ¶¶ 53–54.)

Correctional officers Baker and Dent, who oversaw McCarley's cell block, allegedly knew that he did not belong in general population and that he faced a substantial risk of serious harm in the hot bay. (*Id.* ¶¶ 12, 51, 58, 67, 72, 121.) When McCarley arrived at his cell, his cell mate told him that he was not welcome and threatened to harm him if he stayed in the cell. (*Id.* ¶ 59.) McCarley promptly reported this threat to Baker and Dent and told them that he was in danger, that he was not supposed to be housed in general population, and that he feared for his life. (*Id.* ¶¶ 14, 60, 67.) He asked to be transferred out of St. Clair and to be placed in protective housing in the meantime. In response, Defendant Dent allegedly told

McCarley that they were going to "throw [him] to the wolves" and place him "in the toughest area in the camp." (*Id.* ¶ 62.) McCarley's requests otherwise went ignored. (*Id.* ¶¶ 14, 60, 62, 67.) Thus, he was left to sleep in the unsecured common area of the hot bay. (*Id.* ¶ 64.)

Over the course of about a week, McCarley returned to Baker and Dent several times to reiterate his transfer request and to report new threats of violence. (*Id.* ¶¶ 62, 64–69.) One inmate warned McCarley that "talking the way he talked" was going to get him killed. (*Id.* ¶ 65.) Another inmate offered to sell McCarley to other inmates for sex. (*Id.* ¶¶ 65–66.) McCarley continued to receive similar threats, including other threats to his life. (*Id.* ¶ 67.) Each time McCarley returned to Baker and Dent to report threats and to plead for help, they allegedly ignored his concerns and his transfer requests. (*Id.* ¶ 62, 67, 70.) Once, Dent allegedly brandished a night stick and chased him out of the office. (*Id.* ¶ 63.)

About a week after McCarley transferred to St. Clair, inmate Dion Williams stabbed him and four other prisoners in one day. (*Id.* ¶ 73.) The first two stabbings occurred in O-block, a housing block neighboring McCarley's. (*Id.* ¶¶ 87, 90.) Correctional officers allegedly questioned Williams about one of these stabbings but failed to search him for weapons or impose any security measures to prevent the following attacks. (*Id.* ¶ 91.) Williams then walked from O-block to N-block, where

McCarley was housed. (*Id.* ¶ 15, 89, 92, 95.) To get there, Williams had to exit O-block through a set of doors operated by a correctional officer, walk down a hallway, and enter N-block through a second set of doors operated by Defendant Guthery. (*Id.* ¶¶ 16, 87.) McCarley says this movement was unauthorized and should not have been permitted. (*Id.* ¶¶ 15, 87, 92.)

Once in N-block, Williams stabbed a third prisoner and then attacked McCarley. (*Id.* ¶ 92.) McCarley says Williams "blindsided" him, stabbing him in the chest. (*Id.* ¶ 76.) During a brief struggle, McCarley was stabbed again in his right bicep. (*Id.* ¶ 78.) He collapsed a short distance away while trying to flee. (*Id.* ¶ 79.) When he regained consciousness, he saw "blood pulsating out of his chest." (*Id.* ¶ 80.)

Defendant Guthery allegedly saw McCarley lying on the floor bleeding but did not render first aid. (*Id.* ¶¶ 16, 81, 234–38.) He also did not call for help, despite having access to radios. (*Id.* ¶ 82.) Two inmates eventually carried McCarley to the prison infirmary. (*Id.* ¶ 17, 84.) He was then transferred to a hospital in Birmingham, where he "died" several times while undergoing six hours of life-saving open heart surgery. (*Id.* ¶ 17, 85.)

**B.    McCarley claims that historically widespread violence at St. Clair foretold his attack, and that prison officials should have protected him by implementing policies to reduce that violence.**

McCarley blames several ADOC and St. Clair officials (the "Supervisor Defendants"[2]) for his attack. He claims these officials have turned a blind eye to systemic issues at St. Clair and have failed to curb inmate-on-inmate violence. He further alleges that they were put on notice of these issues by several sources, and that they had the authority to take various actions to reduce the violence yet allegedly failed to do so. Their inaction, according to McCarley, has allowed inmate-on-inmate violence to "become the norm at St. Clair Prison." (*Id.* ¶ 3.)

By the time of McCarley's attack, the reported rate of assaults at St. Clair allegedly "far exceeded typical levels" at comparable facilities. (*Id.* ¶ 103.) From 2010 to 2016, the prison reported a more than ten-fold increase in the number of inmate assaults: 23 in 2010; 59 in 2011; 78 in 2012; 101 in 2013; 127 in 2014; 157 in 2015; and 249 in 2016. (*Id.* ¶ 97.) The number of reported assaults in 2017 and 2018—the two years preceding McCarley's attack—was 132 and 163, respectively. (*Id.*) And McCarley claims that the true number of assaults is higher because many assaults go unreported. (*Id.* ¶¶ 98, 107–08.)

---

[2]     Jefferson Dunn, ADOC Commissioner; Steve Watson, ADOC Associate Commissioner for Plans and Programs; Arnaldo Mercado, ADOC Chief Law Enforcement Officer; Edward Ellington, ADOC Institutional Coordinator responsible for St. Clair; Karla Jones, Warden; Errol Pickens, Assistant Warden; Nekitris Estelle, Head of Classification; Gary Malone, Captain; Kevin White, Captain; Carla Graham, Captain; and Antoine Price, Lieutenant.

Violence at St. Clair was not limited to minor altercations. An alleged corrections expert opined in 2016 that the "frequency of assaults resulting in life-threatening injuries" at St. Clair was "quite simply among the highest [he had] observed in [his] 43-year career in corrections." (*Id.* ¶ 99.) McCarley avers that the homicide rate at St. Clair was forty-five (45) to sixty (60) times higher than the national average for state prisons. (*Id.* ¶¶ 3, 104.) In 2018, St. Clair had the highest per capita homicide rate among Alabama's male prisons, which had the highest homicide rates in the country. (*Id.* ¶ 105.)

Defendant Dunn has acknowledged that St. Clair also "had problems with contraband items, drugs, and weapons." (*Id.* ¶ 245.) A former correctional officer described the problem as "out of control," explaining that a single twenty-four-person cell block could contain thirty to forty contraband knives. (*Id.* ¶ 171.) Besides knives, prisoners had access to other weapons, including firearms and at least one sword. (*Id.* ¶¶ 172–74.) McCarley claims that "it was common knowledge among staff at St. Clair Prison that the inmate population was heavily armed." (*Id.* ¶ 168.) In the three and a half years preceding McCarley's attack, there were 147 documented assaults involving weapons—an average of more than one such assault every nine days. (*Id.* ¶ 102.)

According to McCarley, violence was even more pronounced in the hot bay. In the months leading up to his attack, he claims there were at least thirteen "violent incidents" and at least three murders committed by inmates living or present in the hot bay at St. Clair. (*Id.* ¶¶ 106, 125.) The hot bay was not staffed with additional correctional officers or equipped with additional security devices, despite the alleged intentional concentration there of inmates with recent histories of violence. (*Id.* ¶ 53–54.) A single correctional officer often was responsible for monitoring the entire housing block. (*Id.* ¶ 56.) McCarley states that such officers often were untrained and either "asleep or otherwise inappropriately distracted instead of providing proper oversight." (*Id.* ¶¶ 56, 142.)

McCarley identifies several problems within St. Clair that he contends caused weapons and violence to proliferate. They include, among other things, the failure to separate violent inmates from nonviolent inmates, chronic overcrowding and understaffing, inadequate officer training, inadequate inmate supervision, the failure to search for and confiscate weapons, the failure to follow and enforce numerous standard operating procedures, and the failure to discipline inmates and officers for misconduct. (*Id.* ¶¶ 144, 155, 166–69, 179, 185, 200–01, 204, 216, 244, 249, 252, 260, 266, 274, 278, 284, 287, 293, 296, 309–11, 317–19, 325–27). McCarley's 340-paragraph amended complaint also describes a multitude of other issues, along with

specific example incidents, related to: improper inmate housing (*id.* ¶¶ 118–30); inmates' unanswered pleas for help (*id.* ¶¶ 131–38); insufficient staffing and supervision (*id.* ¶¶ 139–53); unauthorized inmate movement throughout the prison (*id.* ¶¶ 154–65); and the proliferation of contraband weapons (*id.* ¶¶ 166–80).

Several sources allegedly put Defendants on notice of the conditions at St. Clair. (*See id.* ¶¶ 181–205). Specifically, McCarley states that personal observations, media coverage, internal records and reports, prisoner litigation, and an investigation and report from the Department of Justice ("DOJ") made Defendants aware of potentially unconstitutional conditions persisting at St. Clair. (*Id.* ¶ 182.)

The DOJ began investigating civil rights violations at St. Clair and other ADOC facilities in 2016. It publicized its findings the month before McCarley was stabbed and sent a report directly to several of the Supervisor Defendants. (*Id.* ¶¶ 53, 100, 184–85.) The investigation allegedly revealed, among other things, excessive violence, a proliferation of weapons, and "dangerous levels of understaffing and violations of prison policies that allowed the proliferation [of weapons] to occur." (*Id.* ¶¶ 101, 186–87, 142.) Following the investigation, the United States of America sued Alabama and ADOC for allegedly "fail[ing] or refus[ing] to correct the unconstitutional conditions in Alabama's prisons for men." (*Id.* ¶ 110–11.)

In 2014, the Equal Justice Initiative ("EJI") sued several Alabama prison officials, including Defendants Dunn and Watson, on behalf of a class of prisoners (the "*Duke* litigation"). (*Id.* ¶¶ 5, 191.) The plaintiffs asserted constitutional claims like McCarley's. (*See id.* ¶¶ 192–93.) The *Duke* litigation ended with a settlement agreement, in which ADOC and St. Clair officials, including Defendants Dunn and Watson, agreed to a host of reforms designed to reduce inmate-on-inmate violence. (*Id.* ¶¶ 5, 195.) The following year, the EJI issued a report detailing ADOC's alleged failure to effect the reforms agreed to in the settlement. (*Id.* ¶ 196.) Six months later, the EJI sent a letter to Defendant Dunn, expressing concerns about an "increase in serious incidents of violence" at St. Clair, and warning about the spread of contraband weapons. (*Id.* ¶ 197.)

The 2018 EJI letter sent to Defendant Dunn allegedly provided specific actions and policies that the Supervisor Defendants could take and implement to reduce contraband at St. Clair. (*Id.* ¶ 198.) For example, it suggested locking down the facility for several days to "conduct a thorough unannounced shake down of all areas." (*Id.*) It also proposed requiring roving officers to regularly conduct random cell searches, which would randomly be validated by supervisors. (*Id.* ¶¶ 115, 198.)

Two former ADOC and St. Clair officials also issued formal plans to reduce the risk of violence at St. Clair. One, the "Estes Plan," required shift supervisors to

investigate inmate safety concerns in a timely manner, draft reports of their investigations and any actions taken, and then forward those reports to their captains for further review and evaluation. (*Id.* ¶ 114.) Another, the "Daniels Plan," contained a "Controlled Movement Directive," which required heightened supervision of both staff and prisoners. (*Id.*) It also limited the time prisoners in the hot bay could be out of their cells and directed that a warden and captain be assigned to work in the hot bay. (*Id.*) Internal ADOC records, however, noted "the nearly universal understanding" by correctional officers "of all ranks" that "the Controlled Movement Directive was not being followed at the direction of the wardens." (*Id.* ¶ 117.) McCarley states that both the Estes Plan and the Daniels plan contained several other directives that could have reduced the risk of violence at St. Clair but were never implemented. (*Id.* ¶ 115, 117.)

The amended complaint specifies wide-ranging measures that each Supervisor Defendant allegedly had that authority to take to reduce the risk of violence at St. Clair. Some, for example, allegedly could have ordered shakedowns and cell searches, or could have disciplined employees for failing to follow ADOC policies. (*Id.* ¶¶ 249–50.) Others allegedly could have provided training and resources to aid in the detection and confiscation of weapons, or they could have established tiered rotations to reduce the negative effects of understaffing. (*Id.*

¶ 263–64.) Still others allegedly had the authority to ensure compliance with the Daniels Plan and the terms of the *Duke* settlement (*id.* ¶ 272); to ensure compliance with prison policies restricting inmate movement (*id.* ¶ 278); to ensure that housing re-assignment requests and threat reports were appropriately documented and addressed (*id.* ¶ 278); and more. McCarley asserts that the Supervisor Defendants' failure to take these actions amounts to a deprivation of his constitutional right to protection from violence at the hands of other inmates.

## II.    Standard of Review

In general, a pleading must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, to withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint "must plead enough facts to state a claim to relief that is plausible on its face." *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1347–48 (11th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Stated another way, the factual allegations in the complaint must be sufficient to "raise a right to relief above the speculative level." *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1291 (11th Cir. 2010). A

complaint that "succeeds in identifying facts that are suggestive enough to render [the necessary elements of a claim] plausible" will survive a motion to dismiss. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1296 (11th Cir. 2007) (quoting *Twombly*, 550 U.S. at 556) (internal quotation marks omitted).

In evaluating the sufficiency of a complaint, this Court first "identif[ies] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. This Court then "assume[s] the[] veracity" of the complaint's "well-pleaded factual allegations" and "determine[s] whether they plausibly give rise to an entitlement to relief." *Id.* Review of the complaint is "a context-specific task that requires [this Court] to draw on its judicial experience and common sense." *Id.* If the pleading "contain[s] enough information regarding the material elements of a cause of action to support recovery under some 'viable legal theory,'" it satisfies the notice pleading standard. *Am. Fed'n of Labor & Cong. of Indus. Orgs. v. City of Miami*, 637 F.3d 1178, 1186 (11th Cir. 2011) (quoting *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683–84 (11th Cir. 2001)).

## III.    Analysis

McCarley asserts one negligence claim against all Defendants (Count IV) and three § 1983 claims against different Defendants (Counts I–III). In Count I, McCarley claims that Defendants Baker and Dent ignored his repeated requests—

and their obligation—to rehouse him in administrative housing and away from violent inmates. In Count II, he claims that Defendant Guthery witnessed his attack but allegedly refused to render aid or call for help. In Count III, he claims that, for years, the Supervisor Defendants have disregarded known, substantial risks of violence at St. Clair that they could have prevented or mitigated. Defendants argue that McCarley fails to state a claim sufficient to overcome the defenses of qualified immunity and state-agent immunity.

This Court's analysis proceeds first by laying out the principles of qualifying immunity, then by addressing McCarley's § 1983 claims against the Supervisor Defendants, Defendants Baker and Dent, and Defendant Guthery; it concludes by discussing his negligence claim and state-agent immunity. As explained below, McCarley has plausibly stated each of his claims, and Defendants are not entitled to immunity at this stage of the litigation. Accordingly, Defendants' motions to dismiss are due to be **DENIED**.

### A.  McCarley must plausibly plead a violation of a clearly established constitutional right to overcome qualified immunity.

Qualified immunity "allow[s] government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 733 (11th Cir. 2010)

(quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002)); *Mitchell v. Forsyth*, 472 U.S. 511, 525 (1985) ("Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery.").[3]

To overcome a qualified immunity defense, a plaintiff must meet two requirements. *Brown*, 608 F.3d at 734. First, the plaintiff's allegations, taken as true, must establish that the defendant violated a constitutional right. *Id.* Second, the violated right must have been "clearly established" when it was violated. *Id.* "[T]his two-pronged analysis may be done in whatever order is deemed most appropriate for the case." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 129 (2009)).

---

[3]    To receive immunity, the government official ordinarily must first establish that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee*, 284 F.3d at 1194 (quoting *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)). But here, McCarley does not dispute that Defendants were acting within the scope of their discretionary authority at all times relevant to the complaint. (*See* docs. 99, 107; *see also* doc. 91 ¶ 38 ("Each of the Defendants … acted under the color of state law when engaging in the misconduct described herein.").)

A right was clearly established when it was violated if "the state of the law gave the defendants fair warning that their alleged conduct was unconstitutional." *Washington v. Rivera*, 939 F.3d 1239, 1245 (11th Cir. 2019) (quoting *Vaughan v. Cox*, 343 F.3d 1323, 1332 (11th Cir. 2003)). A plaintiff can demonstrate that a right was clearly established in one of three ways: (1) by showing that "a materially similar case has already been decided"; (2) by showing that "a broader, clearly established principle" controls the novel facts; or (3) by showing that the defendant's conduct "so obviously violates the [C]onstitution that prior case law is unnecessary." *Corbitt v. Vickers*, 929 F.3d 1304, 1312 (11th Cir. 2019) (alteration accepted) (citations omitted).

**B. McCarley plausibly pleads that the Supervisor Defendants displayed deliberate indifference by failing to implement and enforce effective policies to alleviate the widespread violence at St. Clair.**

In Count III, McCarley claims that the Supervisor Defendants displayed deliberate indifference by allegedly failing to protect him from a known, unreasonable risk of serious harm at St. Clair. (Doc. 91 ¶¶ 242, 330.)  The Supervisor Defendants argue that McCarley fails to plausibly plead a violation of clearly established law.

"It is well settled that prison officials must take reasonable measures to guarantee the safety of the inmates, and a prison official violates the Eighth

Amendment's prohibition against cruel and unusual punishment if the official is deliberately indifferent to a substantial risk of serious harm to an inmate who suffers injury." *Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019) (cleaned up) (quoting *Lane v. Philbin*, 835 F.3d 1302, 1307 (11th Cir. 2016)). "To establish a deliberate-indifference claim, a plaintiff must make both an objective and a subjective showing." *Swain v. Junior*, 961 F.3d 1276, 1285 (11th Cir. 2020) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

The objective showing requires a plaintiff to show "conditions that were extreme and posed an unreasonable risk of serious injury to his future health or safety." *Marbury*, 936 F.3d at 1233 (quoting *Lane*, 835 F.3d at 1307). The subjective component requires a plaintiff to show (1) the defendants' subjective knowledge of a risk of serious harm; (2) their disregard of that risk; and (3) conduct that is "more than mere negligence." *Swain*, 961 F.3d at 1285 (quoting *Lane*, 835 F.3d at 1308).

> 1. *Extreme conditions at St. Clair posed an unreasonable risk of serious injury.*

McCarley plausibly alleges that conditions at St. Clair "were extreme and posed an unreasonable risk of serious injury to his future health or safety." *Marbury*, 936 F.3d at 1233. "To establish deliberate indifference based on a generalized risk" of serious harm, as McCarley attempts here, "the plaintiff must show 'that serious inmate-on-inmate violence was the norm or something close to it.'" *Id.* at 1234

(quoting *Purcell ex rel. Est. of Morgan v. Toombs Cnty., Ga*, 400 F.3d 1313, 1322 (11th Cir. 2005)).

The allegations plausibly show that "serious inmate-on-inmate violence was the norm or something close to it" at St. Clair. *See id.* In the year before McCarley was stabbed, St. Clair had the highest per-capita homicide rate among the prisons with the highest homicide rates in the country. (*Id.* ¶ 105.) The reported homicide rate allegedly was forty-five (45) to sixty (60) times higher than the national rate at state prisons. (*Id.* ¶¶ 3, 104.) In the seven years preceding McCarley's attack, the prison reported over 1,000 inmate assaults. (*Id.* ¶ 97.) Inmates used weapons in 147 documented assaults in the three and a half years preceding McCarley's attack—an average of more than one such assault every nine days. (*Id.* ¶ 102.) In a one-year period encompassing McCarley's time at St. Clair, at least 280 prisoners required hospitalization from violent attacks. (*Id.* ¶ 197.) And these reported figures likely understate the true frequency of homicides and violent attacks. (*Id.* ¶ 107–08.) This "excessive risk of inmate-on-inmate violence at [St. Clair] creates a substantial risk of serious harm." *See Purcell*, 400 F.3d at 1320 ("[C]onfinement in a prison where violence and terror reign is actionable.").

The extensive violence at St. Clair is allegedly enabled by conditions including the failure of prison officials to adequately monitor inmates and enforce prison

policies, the inadequate classification and segregation of prisoners, chronic overcrowding and understaffing, and an unchecked abundance of contraband weapons. (Doc. 91 ¶¶ 185–86.) The 2016 DOJ investigation allegedly revealed, among other things, "dangerous levels of understaffing and violations of prison policies that allowed the proliferation" of weapons at St. Clair. (*Id.* ¶¶ 101, 186–87, 142.) McCarley claims that "it was common knowledge among staff at St. Clair Prison that the inmate population was heavily armed," and that "some prison personnel actually encouraged inmates to obtain and use weapons." (*Id.* ¶ 168.) Those "heavily armed" inmates apparently were allowed to roam freely between housing blocks without any intervention by prisoner officials, and numerous inmates have been stabbed by those free-roaming prisoners. (*Id.* ¶¶ 113, 157-65, 187.)

These problematic conditions allegedly were even worse in the hot bay, where violent inmates were concentrated without additional security. (*Id.* ¶¶ 53–54.) Unlike comparable disciplinary units in other correctional systems, which are typically staffed with additional correctional officers, St. Clair did not staff its hot bay with additional officers or implement any additional safety measures, thus allegedly contributing to high levels of violence. (*Id.* ¶¶ 53–54, 120.) A lone cube officer—who may be untrained, asleep on duty, or distracted—was expected to monitor the entire housing block. (*Id.* ¶¶ 56, 142.) ADOC officials have

acknowledged the insufficient monitoring of St. Clair's hot bay and correctional officers' failure to follow ADOC procedures in those housing blocks. (*Id.* ¶ 114.) In the months leading up to McCarley's attack, at least thirteen violent incidents and at least three murders allegedly were committed by inmates living or present in the hot bay at St. Clair. (*Id.* ¶¶ 106, 125.)

This Court finds McCarley's allegations sufficient to plausibly establish that "serious inmate-on-inmate violence [at St. Clair] was the norm or something close to it." *Purcell*, 400 F.3d at 1322; *cf. Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1583 (11th Cir. 1995) (concluding that "inmate-on-inmate violence occur[ing] regularly when the jail was overcrowded," which "was severe enough to require medical attention and even hospitalization on occasion," was sufficient for a reasonable jury to find a substantial risk of serious harm).

### 2. *The Supervisor Defendants were aware of the conditions at St. Clair.*

The allegations plausibly establish that the Supervisor Defendants were aware of the substantial risk of violence at St. Clair. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence … and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.

McCarley alleges that the Supervisor Defendants were aware of the substantial risk of serious harm at St. Clair based on their personal observations, the DOJ report, the EJI letter, prisoner litigation, extensive media coverage, and receipt of various internal reports. (Doc. 91 ¶¶ 165, 182.) He claims that many of the Supervisor Defendants have been named in other lawsuits alleging unconstitutional conditions at St. Clair, including the *Duke* litigation. (*Id.* ¶¶ 189–90.) The DOJ allegedly publicized its investigation report and sent its findings directly to several of the Supervisor Defendants. (*Id.* ¶ 185.) The year before McCarley's attack, the EJI sent a letter to Defendant Dunn highlighting the "increase in serious incidents of violence" and the spread of weapons throughout St. Clair. (*Id.* ¶ 197.) Murders at St. Clair allegedly received "constant media coverage," and The New York Times reported that "well over half to just about everyone" at St. Clair had access to weapons. (*Id.* ¶¶ 175, 188.) Furthermore, each Supervisor Defendant allegedly routinely reviewed incident reports, investigations and intelligence reports, duty officer reports, disciplinary records, medical records, annual and monthly ADOC data reports, and inmate progress reports that detailed the allegedly rampant violence at St. Clair Prison. (*Id.* ¶¶ 183, 245, 254, 262, 268, 276, 283, 291, 300, 307, 315, 323.) This Court finds these allegations sufficient to plausibly establish the Supervisor Defendants' awareness of a substantial risk of serious injury at St. Clair.

*See Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1029 (11th Cir. 2001) (en banc) (finding allegations that various reports and communications revealed "longstanding and pervasive" problems at a jail sufficient to show subjective knowledge of a substantial risk to inmate safety).

### 3.  *The Supervisor Defendants allegedly recklessly disregarded known risks.*

"Mere knowledge of a substantial risk of serious harm, however, is insufficient to show deliberate indifference." *Hale*, 50 F.3d at 1583. McCarley must also plausibly allege that the Supervisor Defendants disregarded that substantial risk by conduct that is "more than mere negligence." *Swain*, 961 F.3d at 1285. One way to meet this standard, as McCarley does here, is by alleging that the Supervisor Defendants "knew of ways to reduce the harm but knowingly [or recklessly] declined to act." *Hale*, 50 F.3d at 1583.

McCarley describes several sources that outlined specific steps that the Supervisor Defendants could have taken to address the systemic issues at St. Clair. They include the settlement from the *Duke* litigation, the 2018 EJI letter, the Estes Plan, and the Daniels Plan.

The *Duke* settlement described and required a number of reforms, including the creation of an incident management system to help prison officials prevent, track, and respond to violent incidents; the implementation of procedures governing the

documentation, review, and timely disposition of housing transfer requests; special safety units; and significant structural reforms intended to protect incarcerated people with safety needs. (Doc. 91 ¶ 195.) McCarley states that Defendants Dunn, Watson, Ellington, Jones, and Estelle had the authority to implement and oversee compliance with these reforms. (*Id.* ¶¶ 250, 257–58, 272, 277, 279, 301–03.)

The EJI letter provided specific actions and policies that would reduce contraband, including requiring roving officers to regularly conduct random cell searches and requiring supervisors to randomly validate the accuracy of those searches. (*Id.* ¶¶ 115, 198.) Defendants Dunn, Mercado, Ellington, Jones, Pickens, Price, Malone, White, and Graham allegedly had the authority to order, ensure, or supervise such searches. (*Id.* ¶¶ 249, 264, 271, 278, 286–87, 296, 309–11, 318–19, 326–27.)

The Estes and Daniels Plans contained several directives designed to reduce the risk of violence at St. Clair. For example, the Estes Plan contained directives for for investigating and documenting safety concerns in a timely manner. (*Id.* ¶ 114.) The Daniels Plan contained the "Controlled Movement Directive," which (1) required heightened supervision of both staff and prisoners, (2) limited the time prisoners in the hot bay could be out of their cells, and (3) directed that a warden and captain be assigned to work in the hot bay. (*Id.* ¶ 116.) Both plans described several

ways to reduce the harm at St. Clair that the Supervisor Defendants allegedly knew about and had the authority to act upon but failed to do so.  (*Id.* ¶¶ 250, 258, 272, 279, 287, 295, 309, 311, 318–19, 326–27.) *See Hale*, 50 F.3d at 1583.

McCarley's allegations go one step further, suggesting additional actions that could have been taken to mitigate the systemic issues at St. Clair. Indeed, the amended complaint contains many specific, detailed allegations describing the actions each Defendant had the authority and opportunity to take. (Doc. 93 ¶¶ 247–50, 255–58, 263–64, 269–72, 277–79, 284–87, 292–96, 301–03, 308–11, 316–19, 324–27.) For example, he alleges that the staffing shortages could have been mitigated by "increasing camera coverage or establishing tiered rotations that would reduce the amount of time that inmates are allowed outside of their assigned cells." (*Id.* ¶ 145.) Despite the apparent abundance of steps that the Supervisor Defendants could have taken to reduce the violence at St. Clair, they allegedly failed to institute any reforms or take any reasonable action to address the problems at St. Clair. (*Id.* ¶¶ 144, 146, 176, 178, 196.)

The Supervisor Defendants argue that they acted reasonably because they had policies in place to address the issues at St. Clair. These include policies requiring cell searches for weapons, searches of common areas, prison-wide searches, and "random shakedowns." (*Id.* ¶¶ 168, 178, 180, 249.) They also include policies

requiring annual internal and external safety audits. (*Id.* ¶¶ 200–01.) McCarley agrees that these policies *would* have reduced the substantial risk at St. Clair *if* they had been enforced—but he claims they were not. The required annual safety audits, for example, allegedly have not been conducted since 2014. (*Id.*) A supervisor's conscious refusal to enforce a policy is identical to the absence of that policy. *See Ingram v. Kubik*, 30 F.4th 1241, 1255–56 (11th Cir.), *cert. dismissed*, 142 S. Ct. 2855 (2022). Because McCarley alleges that the Supervisor Defendants could have enforced these policies but knowingly failed to do so, therefore, they cannot rely on the mere existence of the policies to argue that they acted reasonably. *Id.*

Thus, having plausibly alleged that the Supervisor Defendants knowingly or recklessly failed to correct unconstitutional conditions existing at St. Clair when they had the authority to take remedial action, McCarley has sufficiently stated his deliberate indifference claim. *See LaMarca v. Turner*, 995 F.2d 1526, 1538–39 (11th Cir. 1993) ("The wrong in Eighth Amendment cases is the deliberate indifference to a constitutionally infirm condition; that wrong must, in turn, have been the proximate cause of the plaintiffs' injuries, here the injuries brought about by the assaults."); *cf. Marsh*, 268 F.3d at 1029 ("Conditions, like those in this case, where violent prisoners are allowed free reign of a jail with easy access to weapons without proper supervision by guards could be found to have caused the assaults on

Plaintiffs."). Next, McCarley must establish that his allegations show the violation of a clearly established constitutional right.

### 4. *The allegations plausibly show violations of clearly established law.*

McCarley cites three opinions that he claims "gave the defendants fair warning that their alleged conduct was unconstitutional." *Washington*, 939 F.3d at 1245. "Fair warning comes in the form of [materially similar] binding caselaw from the Supreme Court, the Eleventh Circuit, or the highest court of the state ([Alabama], here) that makes it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates a federal law." *Jones v. Fransen*, 857 F.3d 843, 851–52 (11th Cir. 2017) (cleaned up) (citing *Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000)). McCarley points to *Hale*, 50 F.3d 1579; *Marsh*, 268 F.3d 1014; and *Dickinson v. Cochran*, 833 F. App'x 268 (11th Cir. 2020), as clearly establishing the relevant law. This Court concludes that *Hale* and *Marsh* but not *Dickinson* clearly established the relevant law.

The plaintiff in *Hale* sued Tallapoosa County and its sheriff after he was beaten in an open area of a jail, leaving him with moderate injuries. 50 F.3d at 1581. Based on evidence that "inmate-on-inmate violence occurred regularly when the jail was overcrowded," and that "the violence was severe enough to require medical attention and even hospitalization on occasion," the court concluded that a jury

"reasonably could find that a substantial risk of serious harm existed at the jail." *Id.* at 1583. In concluding that a jury could also find that the sheriff was deliberately indifferent to that risk, the court pointed to evidence that "measures to reduce the risk of violence … were available to [the sheriff]," and yet the sheriff "did not pursue these measures." *Id.* at 1583–84. In particular, the sheriff's "failure to classify or segregate violent from non-violent inmates, assign inmates to cells or beds, adequately train the jailers, and adequately supervise and monitor the inmates" when those "solutions [were] within his means" reflected deliberate indifference. *Id.* at 1584–85.

McCarley's allegations are virtually identical to the evidence that the Eleventh Circuit found sufficient to support the inmate-plaintiff's claims in *Hale*. *See id.* He alleges "that dangerous high-risk general population inmates were not properly segregated from low-risk inmate[s]" (doc. 91 ¶ 46); the existence of "well-documented incidents of violence caused by improper classification and housing assignments" (*id.* ¶ 122); the "ineffective training of officers" (*id.* ¶ 186); and the "failure to properly supervise and monitor inmates." (*Id.* ¶ 185.) He also claims that the Supervisor Defendants had the authority to pursue a variety of solutions to these conditions. (*Id.* ¶¶ 247-50, 255–58, 263–64, 269–72, 277–79, 284–87, 292–96, 301–03, 308–11, 316–19, 324–27.) If there is a material distinction between *Hale* and this

case, it is that McCarley's allegations paint a picture of much more dire conditions existing at St. Clair. For example, McCarley alleges that "it was common knowledge among staff at St. Clair Prison that the inmate population was heavily armed," and that those "[i]nmates could roam freely without supervision or interference throughout the housing blocks," leading to "weekly stabbings and assaults." (*Id.* ¶¶ 113, 168, 192.) Accordingly, this Court concludes that *Hale* "gave the defendants fair warning that their alleged conduct was unconstitutional." *Washington*, 939 F.3d at 1245.

In *Marsh*, the Eleventh Circuit affirmed the denial of a sheriff's motion to dismiss similar claims made by an inmate. 268 F.3d at 1030. The court first determined that these allegations showed conditions posing a substantial risk of serious harm: violent inmates were not segregated from nonviolent inmates; the jail was occasionally overcrowded and routinely understaffed; officers did not perform prisoner head counts; inmates roamed freely; weapons were readily available; cells were not inspected; written jail policies were not followed; inmates were inadequately screened and classified; and prisoners were not disciplined for misconduct. *Id.* at 1029. It then concluded that the sheriff, who was aware of these conditions, responded unreasonably by allegedly doing "absolutely nothing to alleviate the conditions at the [j]ail, despite repeated warnings and recommendations

for how conditions could be improved." *Id.* Here again, McCarley's allegations are virtually identical. (*See* doc. 91 ¶¶ 6, 19, 46, 51, 56, 113, 115, 122, 142, 144, 168, 177, 179, 182, 185, 192, 202.) Thus, *Marsh* also "gave the defendants fair warning that their alleged conduct was unconstitutional." *Washington*, 939 F.3d at 1245.

As an unpublished opinion, *Dickinson*, 833 F. App'x 268, cannot clearly establish the relevant law. *Crocker v. Beatty*, 995 F.3d 1232, 1241 n.6 (11th Cir. 2021) ("Unpublished cases ... do not serve as binding precedent and cannot be relied upon to define clearly established law." (alteration rejected) (quoting *J W by & through Tammy Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1260 n.1 (11th Cir. 2018))). Nevertheless, it supports this Court's conclusion that *Hale* and *Marsh* clearly established the relevant law in that it relies on those cases in reaching the same conclusion. *See Dickinson*, 833 F. App'x at 274 ("[Defendants] had 'fair warning' under Hale and Marsh that their alleged failure to correct the overcrowding, inmate classification, and contraband issues, which resulted in inmate-on-inmate abuse at the jail, violated a clearly established constitutional right."). Other courts addressing the same or similar claims about the conditions at St. Clair have likewise reached the same or similar conclusions. *See, e.g.*, *Wilson v. Dunn*, 618 F. Supp. 3d 1253 (N.D. Ala. 2022); *D.S. v. Dunn*, No. 2:20-CV-2012-

RDP, 2022 WL 1785262 (N.D. Ala. June 1, 2022); *Barefield v. Dunn*, No. 2:20-CV-917-WKW, 2023 WL 5417550 (M.D. Ala. Aug. 22, 2023).

Defendants rely upon summary judgment opinions and factually distinguishable cases to argue that McCarley has failed to meet his pleading burden.[4] For example, they cite *Marbury*, where the Eleventh Circuit affirmed summary judgment for St. Clair officials on a deliberate indifference claim on the grounds that the plaintiff failed to show a substantial risk of serious harm. 936 F.3d at 1234. Like here, the inmate-plaintiff in *Marbury* sued St. Clair officials after his transfer requests were ignored and he was stabbed in a common area of the prison. *Id.* at 1231–32. Unlike here, however, "[t]he only allegation [the plaintiff] ma[de] about inmate-on-inmate violence [was] his statement that he personally witnessed fifteen inmate-on-inmate stabbings during his time at St. Clair," which "may have occurred over the course of 6 years, for a rate of 2.5 per year." *Id.* at 1234. And the plaintiff "made no allegations regarding the specific features of the prison that would make it

---

[4]      Several Defendants also mistakenly rely upon a heightened pleading standard that has been overruled. (*See* docs. 96 at 4; 104 at 4 ("[W]hen the defense of qualified immunity is or can be asserted, Section 1983 claims are subjected to the heightened pleading standard required by the Eleventh Circuit Court of Appeals." (quoting *Smith v. Durham*, No. CV-040-PWG-0182-M, 2005 WL 8158754, at *5 (N.D. Ala. Mar. 22, 2005)))). Although the Eleventh Circuit previously applied a heightened pleading standard to certain § 1983 claims, it has since held that *Iqbal* overruled that standard. *Randall v. Scott*, 610 F.3d 701, 709 (11th Cir. 2010) ("Pleadings for § 1983 cases involving defendants who are able to assert qualified immunity as a defense shall now be held to comply with the standards described in *Iqbal*.").

particularly violent." *Id.* at 1235. By contrast, McCarley does describe specific features of St. Clair that make it particularly violent, and he alleges at least 147 assaults with weapons occurring in the three and a half years leading up to his attack, for a rate approaching one per week. (Doc. 91 ¶ 102.) Thus, *Marbury* does not support the dismissal of McCarley's claims.

The other opinions cited by Defendants are similarly unsupportive of their motions to dismiss. In *Harrison v. Culliver*, the plaintiff alleged that prison officials "fail[ed] to provide adequate security on the back hallway," but evidence "indicate[d] that only four assaults occurred on the back hallway" in the three years before the plaintiff was assaulted. 746 F.3d 1288, 1299 (11th Cir. 2014). In *Pilcher v. Dunn*, the plaintiff "claim[ed] there was an 'epidemic' of violence at [the prison] prior to [his] incarceration, [but] he cite[d] to only six instances of inmate-on-inmate violence in the two years prior to [his] attack." No. 4:21-CV-00204-ACA, 2023 WL 2756978, at *6 (N.D. Ala. Mar. 31, 2023). The circumstances of these cases stand in stark contrast to the allegations here.

Because McCarley has plausibly pleaded that the Supervisor Defendants were deliberately indifferent to a substantial risk of serious harm at St. Clair, and because the relevant law was clearly established at the time of his attack, they are not entitled to qualified immunity at this juncture. *Brown*, 608 F.3d at 734.

## C. McCarley plausibly pleads that Baker and Dent displayed deliberate indifference by failing to protect him from a substantial risk of harm.

In Count I, McCarley claims that Defendants Baker and Dent displayed deliberate indifference by failing to protect him despite knowing that he faced a substantial risk of harm in the hot bay. Specifically, he asserts that they had the authority and obligation to transfer him out of the hot bay and yet they failed do so. (Doc. 91 ¶¶ 209–28.) Baker and Dent argue that McCarley fails to state a claim and that they are entitled to qualified immunity. Because McCarley plausibly states a claim for violation of clearly established law, Baker and Dent are not entitled to qualified immunity at this stage.

To state his failure-to-protect claim, McCarley must plausibly allege (1) a substantial risk of serious harm; (2) Baker's and Dent's deliberate indifference to that risk; and (3) causation. *Hale*, 50 F.3d at 1582 (citing *Farmer*, 511 U.S. at 828). As explained above, McCarley has plausibly pleaded that the "excessive risk of inmate-on-inmate violence at [St. Clair] creates a substantial risk of serious harm." *Purcell*, 400 F.3d at 1320. To establish the second element, deliberate indifference, McCarley must show that Baker and Dent knew of the substantial risk of harm and of steps that they had the authority to take to reduce that risk, and that they knowingly or recklessly failed to act. *Hale*, 50 F.3d at 1583.

Baker's and Dent's subjective knowledge of the substantial risk of serious harm McCarley faced at St. Clair, and particularly in the hot bay, is plausibly established by "the very fact that the risk was obvious." *Goebert v. Lee County*, 510 F.3d 1312, 1327 (11th Cir. 2007) (quoting *Farmer*, 511 U.S. at 842). Given the apparent notoriety of St. Clair and its hot bay—the "constant media coverage"; the "numerous reports, newspaper articles, and several prior lawsuits"; the DOJ's investigation and report; the EJI's *Duke* litigation; the "common knowledge among staff at St. Clair Prison that the inmate population was heavily armed"; and the prevalence of violence—it is reasonable to infer, as this Court must, that Baker and Dent were aware that they worked in one of the most dangerous prisons in the country. *See Wilson v. Strong*, 156 F.3d 1131, 1133 (11th Cir. 1998) ("In reviewing a motion to dismiss based on qualified immunity, the district court is required to accept the factual allegations in the plaintiff's complaint as true and draw all reasonable inferences in favor of the plaintiff.").

Specific factual allegations further support the conclusion that Baker and Dent knew McCarley faced a substantial risk of serious harm. Having worked in the hot bay, they knew that it was both disproportionately populated by violent inmates and inadequately supervised. (Doc. 91 ¶¶ 13, 209, 220.) They also knew that prison policies—which they allegedly "had the authority and responsibility" to

effectuate—prohibited housing low-risk inmates like McCarley in general population. (*Id.* ¶¶ 51, 211, 217, 222, 227.) Indeed, McCarley "informed them that he was not supposed to be in general population based on his low-level classification" and that he feared for his life. (*Id.* ¶ 60.) In response, Dent allegedly told McCarley that they were going to "throw [him] to the wolves" and place him "in the toughest area in the camp," i.e., the hot bay. (*Id.* ¶ 62.) Dent's response indicates both that he was aware of the risk of violence in the hot bay and that he had the authority to transfer McCarley to another housing unit. McCarley also reported several threats of violence that he received to Baker and Dent. He told them that his cell mate threatened to harm him if he stayed in his cell and that he was being forced to sleep in the unsecured common area of the hot bay. (*Id.* ¶¶ 59–64.) And he "repeatedly told Defendants Baker and Dent that he had received threats on his life and that other inmates had threatened to sell him for sex." (*Id.* ¶ 67.)

Baker and Dent argue that they lacked the necessary subjective awareness of a substantial risk of harm because they could not have anticipated that Williams would come from another cell block and stab McCarley. This argument fails. A prison official may not "escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know

that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." *Farmer*, 511 U.S. at 843.

Considering the general threat of inmate-on-inmate violence at St. Clair together with the threats that McCarley received and reported, this Court concludes that McCarley has adequately pleaded Baker's and Dent's awareness that he faced a substantial risk of serious harm. *See Marbury*, 936 F.3d at 1237 (explaining that "a general threat of inmate-on-inmate violence in a prison [may] bolster an otherwise insufficient unspecified threat of harm"); *compare Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 621 (11th Cir. 2007) (finding subjective knowledge of a substantial risk where the plaintiff informed a prison official that he received death threats from a gang member) *with Carter v. Galloway*, 352 F.3d 1346, 1349–50 (11th Cir. 2003) (rejecting Eighth Amendment claims where the inmate never asked to be placed in protective custody and never told prison officials that he "feared" his attacker or that he had been "clearly threatened").

Baker and Dent disregarded this known substantial risk to McCarley when they allegedly did nothing to ensure his safety, despite having the authority and obligation to do so. McCarley states that both Baker and Dent had the authority and responsibility to document his multiple transfer requests and to convey those requests to superiors; but they did not. (Doc. 91 ¶¶ 217, 227.) They both allegedly

had the authority and responsibility to transfer him out of general population and into administrative housing; but they did not. (*Id.* ¶¶ 218, 228.) They both could have conducted bed counts to ensure that McCarley was not forced out of his cell and into the day room, or they could have monitored and secured the cell block to prevent unauthorized inmates, like Williams, from entering the cell block; but they did not. (*Id.*) Had Baker and Dent taken any of these actions, McCarley contends, he would not have been stabbed. But instead of helping McCarley, Baker and Dent allegedly ignored him, taunted him, and chased him out of the office with a night stick. (*Id.* ¶¶ 62–63, 67, 70.) Taking these allegations as true, this Court concludes that McCarley has adequately stated his deliberate indifference claim against Baker and Dent. *See Hale*, 50 F.3d at 1582.

At the time of this alleged misconduct, it was clearly established that a prison official violates the Eighth Amendment if he is aware of a substantial risk of serious injury, he knows how to reduce that risk by "means available to him," and yet he does nothing. *See Rodriguez*, 508 F.3d at 620, 623 (alteration accepted) (citing *Hale*, 50 F.3d at 1583; *LaMarca*, 995 F.2d at 1539). This "broad[], clearly established principle" gave Baker and Dent "fair warning that their alleged conduct was unconstitutional." *Corbitt*, 929 F.3d at 1312; *Washington*, 939 F.3d at 1245.

Alternatively, as a materially similar case, *Rodriguez* clearly established the relevant law. *See Rodriguez*, 508 F.3d at 620. The plaintiff in *Rodriguez* repeatedly informed prison officials that he had received threats to his life and that he was not safe in general population. *Id.* at 614. He made multiple requests to be transferred out of the prison and to be placed in protective custody. *Id.* His requests were ignored by prison officials who "could have recommended to the classification team that [the plaintiff] be held in protective custody while the threats on his life were investigated," and he was placed into general population where he was stabbed soon after. *Id.* at 616, 620. Finding the evidence sufficient to support the plaintiff's deliberate indifference claim, the Eleventh Circuit reversed the district court's grant of summary judgment for the defendants. *Id.* at 624.

Here, McCarley alleges that, like the plaintiff in *Rodriguez*, he reported several threats made to his life; he informed Baker and Dent that he was not safe in general population and was not supposed to be housed there; he made multiple requests to be transferred from St. Clair and to be placed in protective custody; they could have placed him in protective custody; and yet his pleas for help and his transfer requests were ignored. Because these allegations mirror the claims in *Rodriguez*, which the Eleventh Circuit determined supported a deliberate indifference claim, McCarley has sufficiently pleaded a violation of clearly established law. *See id.* Accordingly,

Defendants Baker and Dent are not entitled to qualified immunity. *Brown*, 608 F.3d at 734.

### D. McCarley plausibly pleads that Guthery was deliberately indifferent to his serious medical need.

In Count II, McCarley claims that Defendant Guthery displayed deliberate indifference to his serious medical needs when Guthery allegedly saw him lying on the ground bleeding "profusely" from multiple stab wounds but did nothing to help. (Doc. 91 ¶¶ 234–37.) Guthery argues that McCarley fails to plead facts plausibly establishing the necessary elements of his claim, and that, regardless, he did not violate clearly established law. Guthery's arguments lack merit.

Courts have long held that "[d]eliberate indifference to a prisoner's serious medical needs is a violation of the Eighth Amendment." *Goebert*, 510 F.3d at 1326 (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). To prevail on a medical needs claim, a prisoner-plaintiff must show (1) an objectively serious medical need; (2) the defendant's deliberate indifference to that need; and (3) that the defendant's wrongful conduct injured the plaintiff. *Id.* Guthery concedes that McCarley's injuries constituted a serious medical need. (Doc. 105 at 6.) Thus, the analysis turns on whether Guthery was deliberately indifferent to McCarley's serious medical need and, if so, whether there is a causal link between Guthery's conduct and McCarley's injury.

A prisoner must demonstrate three things to show that a prison official was deliberately indifferent to his serious medical need: (1) subjective knowledge of a risk of serious harm; (2) a disregard of that risk; and (3) conduct that is more than gross negligence. *Goebert*, 510 F.3d at 1326–27. Subjective knowledge may be established by "inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 1327 (quoting *Farmer*, 511 U.S. at 842). Once subjective knowledge of a substantial risk is established, the second and third prongs are met where the prison official "utterly refuse[s] to respond." *See Patel v. Lanier Cnty. Georgia*, 969 F.3d 1173, 1189–90 (11th Cir. 2020) (finding the defendant's refusal to render any aid to an unconscious plaintiff "worse" than gross negligence).

Guthery's subjective knowledge of a substantial risk of harm is plausibly established by McCarley's allegation that "Guthery observed Mr. McCarley on the prison floor, bleeding from multiple injuries." (Doc. 91 ¶¶ 16, 21, 81, 234–36.) *See Goebert*, 510 F.3d at 1327. That bleeding was not trivial—McCarley claims he saw "blood pulsating out of his chest." (Doc. 91 ¶ 80.)

McCarley's pleadings further establish Guthery's subjective knowledge by inference. McCarley alleges that he was stabbed multiple times in the common area of his housing block; that he "struggled with his attacker" before trying to run away;

that "someone had dragged him after he had collapsed and passed out"; and that Guthery was present during these events and was responsible for monitoring inmates to ensure their safety. (Doc. 91 ¶¶ 37, 74–80, 233.) Taking these allegations as true, it is reasonable to infer that Guthery saw— if not the entire incident—at least enough to appreciate the risk of serious harm to McCarley. *See Wilson*, 156 F.3d at 1133 (requiring district courts to "draw all reasonable inferences in favor of the plaintiff" in reviewing motions to dismiss based on qualified immunity).

McCarley plausibly alleges that Guthery disregarded this substantial risk when he saw McCarley bleeding yet allegedly refused to provide "any assistance at all." (Doc. 91 ¶ 235.) *Cf. Valderrama v. Rousseau*, 780 F.3d 1108, 1116 (11th Cir. 2015) (concluding that the plaintiff "satisf[ied] the first two prongs of the deliberate indifference test" where the defendants "saw that [the plaintiff] was bleeding," knew that he had been shot, and did not "immediately call[] an ambulance"). Guthery did not render first aid, he did not transport McCarley to the infirmary, and, despite allegedly having access to radios and "the authority and opportunity to quickly call for assistance to facilitate medical aid," he did not call for help. (Doc. 91 ¶¶ 82, 235.) Because these allegations show that Guthery "utterly refused to respond," the gross negligence prong is also satisfied. *See Patel*, 696 F.3d at 1190 ("The knowledge of the need for medical care and intentional refusal to provide that

care has consistently been held to surpass negligence and constitute deliberate indifference." (quoting *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985))).

McCarley attempts to establish the final element of his claim, causation, by alleging that Guthery's deliberate indifference increased his risk of death and caused him to "suffer[] serious injuries constituting a violation of his Eighth Amendment rights." (Doc. 91 ¶¶ 83, 240.) Defendant Guthery argues that these conclusory allegations fail to explain how his alleged inaction worsened McCarley's condition. Although this Court agrees that these allegations are somewhat conclusory, they are nonetheless sufficient to state a claim under the circumstances of this case. As the Eleventh Circuit has explained, "[d]eliberate indifference to a prisoner's serious medical needs violates the [E]ighth [A]mendment because denying or delaying medical treatment is tantamount to 'unnecessary and wanton infliction of pain.'" *Brown v. Hughes*, 894 F.2d 1533, 1537–38 (11th Cir. 1990) (quoting *Estelle*, 429 U.S. at 104–05). Thus, McCarley "does not necessarily need to show that the delay in medical care exacerbated his condition because the delay in care is, itself, a wanton infliction of pain and a constitutional violation." *Valderrama*, 780 F.3d at 1116. Given that McCarley alleges he was stabbed multiple times and even temporarily "died" on the operating table, this Court cannot conclude that his failure to specifically

allege pain and suffering warrants dismissal of his claim. *See Wilson*, 156 F.3d at 1133; *cf. Fowles v. TJX Companies, Inc.*, No. 4:21-CV-00198-CDL, 2022 WL 188134, at *2 (M.D. Ga. Jan. 20, 2022) (finding it "reasonable to infer" from the plaintiff's allegation of significant injuries that the plaintiff "contends that she continues to suffer disability, pain and suffering").

Guthery is not entitled to qualified immunity at this stage because he had more than "fair warning" that his alleged conduct was unconstitutional. *Washington*, 939 F.3d at 1245. For more than twenty years it has been "clearly established that knowledge of the need for medical care and intentional refusal to provide that care constitute[s] deliberate indifference." *Harris v. Coweta Cnty.*, 21 F.3d 388, 393 (11th Cir. 1994) (citing *Mandel v. Doe*, 888 F.2d 783, 788 (11th Cir. 1989)). "Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under s 1983." *Estelle*, 429 U.S. at 105. "This broad principle has put all law-enforcement officials on notice that if they actually know about a condition that poses a substantial risk of serious harm and yet do *nothing* to address it, they violate the Constitution." *Patel*, 969 F.3d at 1190 (emphasis in original).

Accordingly, Guthery's motion to dismiss Count II of McCarley's amended complaint is due to be denied.

**E.    McCarley plausibly pleads his negligence claim, and Defendants are not entitled to state-agent immunity.**

In Count IV, McCarley claims that all Defendants are liable under state law for negligently causing his injuries. Defendants argue that he fails to state a claim for negligence and that they are entitled to state-agent immunity. This Court concludes that McCarley has adequately pleaded his claim for negligence and that Defendants' entitlement to state-agent immunity is more appropriately addressed at the summary judgment stage.

To state a claim for negligence, a plaintiff must allege "(1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury." *Lemley v. Wilson*, 178 So. 3d 834, 841 (Ala. 2015) (citation omitted). As McCarley asserts, "prison officials have a duty ... to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (citation omitted). He claims that each Defendant breached this duty through his or her respective acts of deliberate indifference, thereby proximately causing his injuries. McCarley both incorporates relevant factual allegations into his negligence claim and succinctly states the basis of liability for each Defendant. (*See* doc. 91 ¶¶ 331–40.) The allegations thus "give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015). Accordingly, McCarley has sufficiently stated his claim. *See id.*

Alabama law provides immunity to state agents sued in their individual capacities for certain conduct related to their employment duties. *Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000), *holding modified by Hollis v. City of Brighton*, 950 So. 2d 300 (Ala. 2006). However, state-agent immunity does not apply where, as here, a plaintiff sufficiently alleges a constitutional violation. *See id.*; *Taylor v. Hughes*, 920 F.3d 729, 734 (11th Cir. 2019) ("Alabama state-agent immunity shields state employees from tort liability regarding discretionary acts unless they … violated federal or constitutional law…."). Moreover, the Alabama Supreme Court has stated that a determination as to the applicability of state-agent immunity "should be reserved until the summary-judgment stage, following appropriate discovery." *Ex parte Alabama Dep't of Mental Health & Retardation*, 837 So. 2d 808, 814 (Ala. 2002). Because McCarley has sufficiently pleaded constitutional violations, it would be inappropriate for this Court to conclude at this stage that Defendants are entitled to state-agent immunity. *See id.*

## IV. Conclusion

For the reasons discussed above, McCarley has plausibly pleaded violations of clearly established law. Whether his claims will survive scrutiny under the more intense summary judgment standards remains to be seen. For now, however, Defendants are not entitled to immunity. Accordingly, their motions to dismiss are

due to be **DENIED**. The Court will enter an Order consistent with this Memorandum of Opinion.

      **DONE** AND **ORDERED** ON MARCH 7, 2024.

_____
L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

215647